Dahlia GRINDLE, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant.

No. 90 C 6338.

United States District Court,
N.D. Illinois, E.D.

Aug. 15, 1991.

David Nathan Kornfeld, Evanston, Ill., for plaintiff.

Michele M. Fox, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Dahlia Grindle ("Grindle") seeks judicial review of a final decision of Secretary of

Health and Human Services Louis Sullivan ("Secretary") denying Grindle's claim for supplemental security income ("SSI") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423 and 1381(a).[1] As is customary in these cases, the parties have filed Fed.R.Civ.P. ("Rule") 56 cross-motions for summary judgment.[2] For the reasons stated in this memorandum opinion and order, Grindle's motion is granted and Secretary's is denied.

### Facts

Grindle was born on May 16, 1927, has a high school diploma and has no relevant past work experience. She applied for supplemental security income in September 1986, alleging that she was unable to work because of diabetes, hypertension and arthritis. After her initial claim was denied by an administrative law judge ("ALJ") in January 1989, the Appeals Council reversed and remanded the case to ALJ Gilbert Drucker, who found Grindle not disabled in October 1989. That decision became Secretary's final decision in August 1990 when he denied Grindle's appeal.

### Grindle's Testimony

Grindle's alleged difficulties stem from a host of claimed medical impairments: diabetes, bladder problems causing frequent urination and soiling of undergarments, back and leg pain, numbness of the feet and hands, arthritis, hypertension, dizzy spells, weakness and fatigue, leg cramping, neuropathy and a group of eye problems—retinopathy, blurred vision, cataracts and myopic astigmatism (R. 33–38, 42, 43, 53, 55–57, 59, 61, 119–22, 131–32, 183). Out of that assortment of claimed ills, her "primary problem is multiple joint pains related to diabetes and arthritis" (R. 13).

### Medical Evidence

Dr. Cannan Yunez first reported on Grindle's condition in September 1986. Responding to a question about diabetes, arthritis and high blood pressure, Dr. Yunez said (R. 99):

> The claimant does have all these as stated above. She also is obese with a height of 5′ and weight of 179 pounds.... She also has a diagnosis of osteoarthritis of the lumbosacral spine, both knees, and shoulders. She has 40 percent restriction in range of motion in the lumbosacral spine, but very little as far as the legs and shoulders go.... X-rays show osteoarthritis.

In March 1988 Dr. Yunez described Grindle as suffering from "uncontrolled diabetes mellitus" and went on to say (R. 135):

> She also suffers from probable neuropathy consisting of leg pain and numbness. She also complains of cramping in the legs on walking which is probably related to the diabetes also. In addition to the diabetes, she suffers from generalized osteoarthritis. This particularly affects the lumbosacral spine. There are no neurological complications in the spine and there is no significant range of motion limitation due to the arthritis at this time.

Finally, in October 1988 Dr. Yunez completed a "physical capacities evaluation" on Grindle and concluded (R. 149):

> 1. Grindle could not perform "sustained competitive work activity" under the standard (quoted in the evaluation form) that was defined in *Allred v. Heckler*, 729 F.2d 529, 533 (8th Cir.1984).
>
> 2. "Throughout a workday and without distracting pain/discomfort" Grindle was subject to sharp limitations on her activity: maxima of two hours of sitting, ten minutes of standing, ten minutes of

---

**1.** All further statutory references will take the form "Section —," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. Part 404 will be cited simply "Reg. § —."

**2.** What follows in the "Facts" section of this opinion is really not in dispute, so that this case does not pose the problems often created by the need for this Court to adopt a Janus-like set of dual perspectives on cross-motions for summary judgment (see *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991), which repeats the familiar principle that courts are to draw "those inferences that are reasonable" in light most favorable to each nonmovant). All citations to the Administrative Record (the sole point of reference needed to decide the issues) will be in the form "R. —."

walking, carrying ten pounds and lifting ten pounds.

3. Grindle could not "operate foot controls," nor could she "do fine [or] gross manipulation," "bend over" or "squat/stoop."

In November 1988 another treating physician, Dr. F. Boon, conducted his own physical examination of Grindle (R. 156). Dr. Boon concluded that Grindle could lift a maximum of "20–25" pounds and that she could stand and/or walk for "4–6" hours a day, "1–2" of those "without interruption."

In April 1988 Grindle was evaluated by a consultative examiner, Dr. Colette Gordon, who after examining Grindle for 30 minutes (R. 140) found that Grindle had "no significant limitation of motion" (*id.*). However, she did note that Grindle's "gait was abnormal. She walked with slow cautious steps, but no limp" (R. 138). Dr. Gordon also found (R. 139):

> [T]here were no palpable pulses below the femorals on the left. The feet were cold, but had a normal color.

Dr. Gordon offered no evidence or conclusions as to Grindle's ability to lift any particular amount of weight.

At that time the same consultative service conducted an arterial blood flow evaluation and found (R. 136):

> There is no significant additional decrease in blood flow with exercise.

3. Although (as will be discussed at length in this opinion) Secretary relies on ALJ Drucker's reliance on Dr. Triplett's conclusions as supported by "substantial evidence," it is worth noting here and now that the numbers just recited—vital to a finding of "no disability"—were plucked out of thin air rather than being grounded in any record evidence. What Dr. Triplett did was to check off the boxes on Secretary's standard residual functional capacity ("RFC") form, with nothing to support the choice of those particular boxes rather than any more restricted ones (especially as to lifting and carrying) that would have *mandated* a finding of disability.

4. That evaluation parallels an earlier (October 1986) assessment by another nonexamining physician, Dr. Adrian Feinerman (R. 100). Neither Dr. Triplett nor ALJ Drucker relied on that opinion of nearly two years earlier (with the in-person examinations described earlier having taken place in the interim).

During the same evaluation Grindle was required to walk at 2 m.p.h. up a 12% grade slope. That exercise lasted one minute and ten seconds before she became fatigued (R. 136).

In May 1988 nonexamining physician Dr. Hedra J. Triplett reviewed the consultative examination and concluded that Grindle could lift a maximum of 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk a total of 6 hours per day, sit a total of 6 hours per day, and that she had an unlimited ability to push and/or pull (including hand/or foot controls) (R. 147).[3] Dr. Triplett noted no other limitations and in fact opined that Grindle had the residual capacity frequently to climb, balance, stoop, kneel, crouch and crawl and that she had an unlimited capacity for reaching, handling, fingering, feeling, seeing, hearing and speaking (*id.*).[4]

In sum, the two *treating* physicians concluded that Grindle could not perform the tasks required to do medium work, but the *nonexamining* physician found that she could perform at that level.[5] ALJ Drucker accepted the latter view in finding Grindle not disabled.

### Burden of Proof and Rules for the ALJ's Decision

Section 423(d)(1)(A) defines disability as:

5. Reg. § 1567(b) defines "light work" in these terms:

> *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

"Medium work" is described this way (Reg. § 1567(c)):

> *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months. ...

Secretary (and of course the ALJ as his representative) must apply a five-step test to determine whether a claimant is disabled, as *Marcus v. Sullivan*, 926 F.2d 604, 606 (7th Cir.1991) explains:

Step one eliminates those who are still in the workforce. 20 CFR §§ 404.1520(b), 416.920(b). Step two disqualifies claimants who do not have a "severe" impairment. §§ 404.1520(c), 416.920(c). In the third step, the impairments of the claimant are compared to a listing ("Listing") of about 120 medical conditions which the Secretary concedes are severe enough to prevent a person from engaging in any gainful activity. §§ 404.-1520(d), 416.920(d), 416.925(a). If the wage earner's impairments meet or equal a listed impairment, the wage earner is conclusively determined to be disabled. §§ 404.1520(d), 416.920(d). If the wage earner fails to establish equivalence, however, the inquiry is not over. In step four, the Secretary considers whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant can, he is disqualified. §§ 404.1520(e), 416.920(e). Finally, in step five the Secretary asks whether the claimant is able to perform other work in the national economy in view of his age, education and work experience. The claimant is entitled to benefits only if he cannot perform other work. §§ 404.1520(f), 416.920(f).

If the assessment of an individual reaches step five—in other words, if a claimant has a severe impairment that does not meet one of the Listings, and if he or she is not engaged in substantial gainful activity and if his or her impairment prevents the claimant from performing his or her vocationally relevant past work—then the rules in the Medical Vocational Guidelines of Reg. Subpart P, Appendix 2 (the "grid," cited "App. § —") may come into play. Those grid rules reflect the analysis of the vocational factors of age, education and work experience in combination with the claimant's RFC.

■ RFC is defined by Secretary as (*Marcus*, 926 F.2d at 608, quoting SSR 83-10):

[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

Or as the district court put it in *Marcus*, RFC measures "functional ability to stand, sit, follow instructions, lift or accomplish other of the tasks which may be necessary to engage in gainful activity" (926 F.2d at 608, quoting with approval the district court opinion at 696 F.Supp. 364, 368 (N.D.Ill.1988)). RFC is expressed in terms of a claimant's maximum sustained work capability for either "sedentary," "light," "medium," "heavy" or "very heavy" work.

■ Where an ALJ's findings of fact with respect to the vocational factors and RFC coincide with all of the criteria of a particular rule, the rule directs a conclusion of "disabled" or "not disabled." In addition, the grid takes into account the number of unskilled jobs in the national economy at the various functional levels, so that when the findings of fact coincide with a rule the existence of such jobs is established (App. § 200.00(b)). However, nonexertional limitations (such as pain, inability to grasp objects or bimanual dexterity) are not reflected in grid determinations. Hence App. § 200.00(e)(2) provides:

However, where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is

further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

■ In this instance ALJ Drucker found that Grindle can perform medium work. To the extent that conclusion involves *factual* determinations (as contrasted with any questions of *law*), it must be given real deference. This Court has explained that deference in these terms, speaking in the comparable context of a step four RFC inquiry (*Jones v. Bowen*, 699 F.Supp. 693, 695 (N.D.Ill.1988)):

> [A]n ALJ's affirmative answer must be upheld if supported by substantial evidence (*Walker v. Bowen*, 834 F.2d 635, 639 (7th Cir.1987)). That review does not call for reweighing the evidence. If reasonable minds may differ on the outcome of conflicting evidence, the ALJ's decision prevails (*id.* at 640).

As for the concept of "substantial evidence," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938), teaches that term means:

> more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

That definition regularly finds its way into Social Security opinions in this Circuit, whether upholding or overriding Secretary's decisions (see, e.g., *Pitts v. Sullivan*, 923 F.2d 561, 564 (7th Cir.1991)).

That procedural framework forms the matrix for consideration of the ALJ's findings. This opinion turns to that task.

### Applying the Statutory–Regulatory Framework

Reaching his decision at step five of the five-part analysis, ALJ Drucker examined the medical evidence and the other testimony and made these findings (R. 15):

2. The medical evidence establishes that the claimant has diabetes mellitus with mild diabetic retinopathy and generalized arthritis, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's testimony as to disabling multiple joint pain, neck pain, and decreased vision is not credible for the reasons stated in the body of this decision.

4. The claimant considering her impairments singly and in combination with each other has the residual functional capacity to perform the physical exertion requirements of work except for lifting more than 50 pounds occasionally, and lifting or carrying more than 25 pounds frequently. There are no nonexertional limitations (20 CFR 416.945).

5. The claimant has no past relevant work experience.

6. The claimant has the residual functional capacity to perform a full range of medium work (20 CFR 416.967).

7. The claimant is 62 years old, which is defined as closely approaching retirement age (20 CFR 416.964).

9. The claimant has no transferable work skills.

Based on App. § 203.6, the ALJ then found (*id.*) that in spite of her impairments Grindle could perform medium work, was closely approaching retirement age, had no previous work experience and was therefore "not disabled."

■ What was crucial to that conclusion was the ALJ's determination that Grindle could perform medium work: If instead she could perform only light work, App. § 202.04 would mandate that she must be classified as "disabled." Focusing on that issue, P. Mem. 5 asserts that the ALJ did

not properly evaluate Grindle's capacity to perform work.[6]

ALJ Drucker based his conclusion that Grindle could perform medium work on three separate determinations:

1. that the nonexamining physician's evaluation of Grindle was correct and that the two examining physicians were therefore incorrect in their determination of Grindle's ability to perform work (R. 14);

2. that Grindle's own description of her daily activities corroborates the conclusions of the nonexamining physician that she can perform medium work (R. 13–14); and

3. that the consultative exam and in particular the Doppler study of April 1988 contradict Dr. Yunez's report and are more reliable (R. 13–14).

However, that line of analysis does not survive scrutiny under the searchlight of the controlling legal principles.

### Weight of the Treating Physicians' Reports

As just indicated, ALJ Drucker did not give any effect to the detailed opinions and conclusions of the two treating physicians, Drs. Yunez and Boon. Instead he chose to accept the opinion of nonexamining physician Dr. Triplett (R. 14):

While a [sic] examining doctor's views are generally entitled to great weight they are not controlling if unsupported by medically determinable signs, findings and abnormalities. Such is the case here. Because of the lack of significant persistent clinical abnormalities, the undersigned Administrative Law Judge cannot credit the physical capacities evaluations by Dr. Yunez dated October 17, 1988 (Exhibit 23) and that of Dr. Boon found that [sic] exhibit 25. Dr. Boon's

assessment essentially limits the claimant to light sedentary work while Dr. Yunez's evaluation limits the claimant to less than sedentary work. It is important to note that these evaluations are not even consistent with the claimant's own description of her daily activities. Thus it is obvious that they are not aware of what their own patient does at home.

In conclusion, the undersigned agrees with the residual functional capacity opinion of the non-examining medical advisor (Exhibit 25 [sic—should be 20]) and finds that the claimant can perform a full range of medium work which requires prolonged standing and walking, lifting up to 50 pounds occasionally, and lifting or carrying up to 25 pounds frequently.

D. Mem. 7 argues that it was proper for the ALJ to disregard the evidence submitted by the two treating physicians and to base his conclusions on the evaluations of a nonexamining physician:

The Seventh Circuit has recognized that an assessment by a non-examining physician such as may constitute substantial evidence even if it conflicts with a treating physician's assessment. *Garrison v. Heckler*, 765 F.2d 710 (7th Cir.1985); *see also Steward v. Bowen*, 858 F.2d 1295 (7th Cir.1988).

Secretary also cites *Reynolds v. Bowen*, 844 F.2d 451, 454–55 (7th Cir.1988) for the propositions (1) that there could be incentives for a treating physician to find a disability where there is none and (2) that "[a] consulting physician may bring both impartiality and expertise." Secretary's selective citations do not fairly present the current state of the law in this Circuit and—importantly—wholly fails to mention Secretary's own public position on this issue.

Accordingly, we hold that even if a claimant properly appeals some issues to the Board, the claimant may not obtain review of the ALJ's decision on any issue not properly raised before the Board.

Accord, *McBride v. Sullivan*, 756 F.Supp. 361, 363 (N.D.Ill.1991), citing *Hix*.

---

**6.** P. Mem. 7 also contends that the ALJ did not consider Grindle's "true education level." But Grindle, having never raised that issue before either the ALJ or the Appeals Council, has failed to exhaust her administrative remedies and therefore cannot make the argument here in the first instance. *Hix v. Director, Office of Workers' Compensation Programs*, 824 F.2d 526, 527 (6th Cir.1987) (citation omitted) states:

**1508**

Although the amount of weight to be accorded treating physicians' evidence has been a matter of some controversy, all Courts of Appeals have generally agreed that the opinions of treating physicians must be given some extra weight when compared to a nonexamining/nontreating physician's opinion. For example, *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir.1989) (citations omitted) states that an ALJ must give a:

> treating physician's opinion special weight [because] he is employed to cure and has a greater opportunity to know and observe the patient as an individual.

In our Circuit *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982) (citations omitted) expressed the selfsame view and has frequently been cited for that principle:

> If the ALJ concludes that a treating physician's evidence is credible, therefore, he should give it controlling weight in the absence of evidence to the contrary because of the treating physician's greater familiarity with the plaintiff's conditions and circumstances. If, however, the ALJ finds that the treating physician's evidence is not credible, he is not required to give it controlling weight.

Simply because a nonexamining physician may disagree with the conclusions of a treating physician, that is just not enough to support a finding that the treating physician's evidence is not credible (*id.*).

*Whitney, id.* at 787 supported its reasoning with the fact that in that case:

> No government physician examined Whitney, and no government witnesses were called at the hearing.

*Whitney* parallels this case: There too there were two examining physicians who concluded that the claimant could not perform at a level that would find her not disabled—only the nonexamining physician supported the ALJ's finding that she was not disabled (*id.*).

---

7. [Footnote by this Court] It is important to note that *Garrison* was a black-lung case in which the medical evaluations were primarily based on objective evidence, in which case there was no reason to give preference to the opinions

D. Mem. 7 implies that the general treating-physician preference announced in *Whitney* has been discarded by *Garrison*. But *Garrison*, 765 F.2d at 715 says:

> The preference for the views of the treating physician discussed in *Allen* [*v. Weinberger*, 552 F.2d 781, 785–86 (7th Cir.1977)] and *Whitney* applies only when ability to observe the claimant over an extended period is essential to an accurate understanding.

Indeed, *Garrison* announced an exception to the preference—not a rejection of the preference itself. Under that exception, if the expertise of a reviewing physician is at least as great as that of the treating physician and if the reviewing physician has examined the same basic evidence as was seen by the treating physician, there is no reason to give the opinion of the treating physician any special weight. In fact, *Garrison* itself (*id.* at 713 (citations omitted)) confirms that the *Whitney* principle was *not* being abandoned:

> We adhere to the rule of *Allen* and *Whitney* that a consulting physician cannot supply substantial evidence just by contradicting reports about the underlying facts or offering unfounded speculation. But when the consulting physician adds new information or perspectives, that may be substantial evidence.[7]

That exception to the rule is exemplified by *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir.1985) (citations omitted), which—while holding that the ALJ could sometimes disregard the opinion of a treating physician—expressly stated in language that might have been tailor-made for this case:

> When experience backed by observation is set against the "speculative statement" of a consulting physician, substantial evidence lies on the side of the treating physician.

And as the concurrence by Judge Flaum explains (*id.* at 290–91):

> of the treating physician (*id.* at 714). In fact, both the treating and consultative physicians in *Garrison* had observed the claimant "first hand" (*id.* at 715).

The ALJ's decision to give greater weight to the consulting physician's opinion was completely appropriate, notwithstanding *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982), because the consulting physicians in this case personally examined the claimant.

Added insight into the respective roles of the general treating physician preference and the consulting-physician modification is afforded by the case law discussion of the very different situation where the consultant is an expert in the field at issue and is examining test results, while the treating physician is not an expert and is examining the same data. *Peabody Coal Co. v. Helms*, 901 F.2d 571, 573 (7th Cir.1990) (citations omitted) explains:

A blanket rule that the opinion of the treating physician is entitled to greater weight than that of a consulting physician is arbitrary. If the treating physician is not a specialist in black lung disease but the consultant is, and if a judgment of disability depends to a great extent on the expert interpretation of documentary data, such as X-rays and the results of gas and ventilatory tests, than reason may require that the consultant's opinion be given equal or even greater weight than the treating physician's. Administrative agencies are not free to disregard reason.

But *no* such expertise of the nonexamining physician is present (or claimed) here. In fact, Secretary offers no argument that Grindle does not have osteoarthritis or diabetes. What is in controversy is the extent to which those and other conditions affect Grindle's ability to work. And to measure that—in the absence of any objective test—the record has only the direct observations of the treating physicians, which must perforce be given more weight than the *non*-observations of Dr. Triplett. Indeed, this case poses a striking contrast to the concern voiced in *Reynolds*, 844 F.2d at 454–55:

The patient's regular physician may want to do a favor for a friend and client, and so that treating physician may too quickly find disability.

Neither treating physician here committed the error of opining as to disability—a legal concept. Instead each made factual findings as to Grindle's physical capacities—and D. Mem. 8 has no support in the record for its assertion that "those opinions appear to be primarily based upon plaintiff's subjective allegations." Conversely, Dr. Triplett's wholly-non-record-based checking off of the boxes on the RFC form that just happen to coincide exactly with the Regulations' definition of medium work (which just happens to coincide with a conclusion of "no disability") certainly suggests an obverse paraphrase of the *Reynolds* speculation:

Secretary's non-specialist consulting physician may want to do a favor for a client, and so that consultant may too quickly find no disability.[8]

Not only is the law clear in this Circuit (and others) that the ALJ must normally give extra weight to a treating physician's evaluation, but Secretary and his predecessors have agreed with the general rule at least since 1986. In response to some confusion among ALJs as to the meaning of that rule, together with Secretary's insistence that administrative policy coincided with the Second Circuit case law, *Schisler v. Heckler*, 787 F.2d 76, 83–84 (2d Cir.1986) ordered Secretary to inform the ALJs that she had adopted that "treating-physician's rule." Secretary then proposed a new Social Security Ruling ("SSR") that would specifically address the rule. *Schisler v. Bowen*, 851 F.2d 43, 46–47 (2nd Cir.1988) contains the draft of that SSR.

Then after a period of public comment, the SSR was fully adopted effective August 1, 1991 via Amendments to 20 C.F.R.

---

**8.** This is not at all an effort to substitute this Court's weighing of the evidence for that of the ALJ. It rather demonstrates the obvious reality that there may be reasons to be skeptical of expert witnesses of every stripe, so that the usual judicial preference for the treating physician's medical opinions where the consultant has no special expertise reflects (1) the balancing out of such justifiable skepticism and (2) the residual weight to be given to the treating professional's *in-person* evaluations.

Parts 404 and 416, 56 Fed.Reg. 36,932 (1991) (the "Final SSR"). What is significant is (1) that the treating-physician preference, as it relates to the facts here, was clearly set forth in both the proposed and final SSR and (2) that as early as 1986 Secretary's predecessor stated that was already his policy. In the proposed SSR, Secretary stated that he would give "some extra weight" to the opinions of treating physicians, "even if contradicted by substantial evidence" (*Schisler*, 851 F.2d at 47). Secretary took the phrase "some extra weight" from the earlier *Schisler*, 787 F.2d at 81 (see Final SSR, 56 Fed.Reg. 36,951).

In the Final SSR Secretary adopted an even more detailed method of how an ALJ should give more weight to a treating physician's opinion. Secretary explained (*id.*):

> We believe that the revisions make clear that our policy provides a very specific and detailed process for evaluating medical opinions, a process that takes into account and, in large measure, was shaped by, the kinds of concerns raised by the circuit courts. If a particular treating source is an individual who is more familiar with a claimant's medical condition, we will always give special deference to the source's opinions about the nature and degree of a claimant's impairment(s). If such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, we will give it controlling weight. However, a treating source's opinion does not have to be consistent with other substantial evidence, and it does not necessarily have to be supported by objective evidence in order to receive some special deference.

Amended Reg. § 416.927(d)(1) in the Final SSR ("Amended Reg.," 56 Fed.Reg. 36,969) thus states:

> Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

And like *Garrison*, the Final SSR takes into account the value of specialization and the nature of the treatment relationship as well as other factors (Amended Reg. § 416.927(d)(2) to (6), 56 Fed.Reg. 36,969).

■ In short, the Final SSR is consistent with the treating-physician preference as adopted by *Whitney* and qualified by *Garrison*. Of course, the Final SSR is much more detailed than was the principle as explained in the opinions from our Court of Appeals and others, but for current purposes it is enough to say that at the time of the hearing (and still now) ALJs have been required to give special deference to the opinions of treating physicians. And of course such an administrative interpretation is not only binding on Secretary's ALJs such as Drucker but must also be honored by the courts so long as it does not do violence to the statute that is being applied. Finally, although the Final SSR is described as a regulation that has prospective effect (it says "The Secretary will be applying these final rules as the appropriate legal standard for evaluating treating physician opinion evidence in claims before the Agency"), it is surely appropriate to treat the underlying principle as applicable here:

1. Secretary had made it plain in *Schisler* that the principle was one that was already being applied uniformly at the administrative level.

2. Moreover, if this Court were simply to remand the case because of the problem of inappropriate reliance on the consultant to the exclusion of the treating physicians, Secretary would be expected to apply the Final SSR in any event.

■ But ALJ Drucker gave the opinions of the two treating physicians no such extra weight—or any weight at all. No, he simply disregarded those opinions and accepted instead the opinion of the one non-examining physician. His stated reason was that the treating physicians' reports were not based on objective evidence (R. 14). But that distorts the record. In the case of Dr. Yunez's report, the only permissible inference—there being no suggestion to the contrary—is that his conclusions were based on his long-term observation of

Grindle as well as on the x-ray that revealed osteoarthritis (R. 99). And as for Dr. Boon, his critical conclusions as to lifting and carrying are clearly based on the "physical exam" that he gave Grindle (R. 156).

But because the x-ray was not made a part of the record and in the absence of "medically determinable signs, findings and abnormalities," ALJ Drucker assumed that because he need not give the examining doctors' conclusions "controlling" weight, he need not give them any weight at all. That was plain error. Although it may be argued precisely how much weight should be given, at least as *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir.1989) (per curiam) states (citing *Garrison*), it must "be given some deference." And thus in the absence of some countervailing substantial evidence, the ALJ's method was fatally flawed.[9]

*Other Claimed "Substantial Evidence"*

■ It has already been said that the ALJ also cited two other reasons for his disregard of the two treating physicians' opinions: Grindle's own testimony and the consulting examination's Doppler test. As with the ALJ's reliance on Dr. Triplett, any such use of those factors tells more about the ALJ's mindset or predilections than about the substantiality of such evidence to support his conclusions.

*Grindle's Testimony*

Although ALJ Drucker found in evaluating Grindle's "pain" and "vision" that Grin-

dle's testimony was not credible (R. 15),[10] he thought that Grindle was a credible enough witness to use her testimony to counter the opinions of the treating physicians. ALJ Drucker stated (citation omitted) (R. 13):

> The claimant's testimony as to her daily activities is markedly contrasted with the claimant's further testimony as to her functional limitations. In essence, the claimant testified that she could not do prolonged standing or walking and could only lift up to five pounds. However, the claimant acknowledged that she shops, takes the elevated train and bus, goes to church, reads, cooks, washes dishes, makes beds, dusts, mops, sweeps, and vacuums. Her complaints of disabling pain are inconsistent with her testimony that she has no difficulty with concentration or sleep. There has been no weight loss or change in appetite. It was stipulated that if the claimant's daughter, Donna testified her testimony would be essentially the same as the claimant.

It is true that an ALJ may compare a claimant's "activities" to his or her "complaints" to determine whether the treating physician's opinion is correct (*Reynolds*, 844 F.2d at 454). But ALJ Drucker's characterization of Grindle's testimony is misleading at best. In fact Grindle's own statements do not conflict with the treating physicians' reports—she rather corroborates them.

---

9. At the risk of beating a dead horse, it must not be forgotten that the critical watershed between the capacity to do light work and the ability to do medium work is a function of how much a person can lift—both frequently and occasionally. Of course a physician—a trained observer—can make an informed evaluation on that score based on in-person observations (especially over an extended period of time). But again where did Dr. Triplett's numbers come from if not out of the blue? If anyone has any doubt as to the arbitrariness and non-record-based nature of Dr. Triplett's conclusions, it should be dispelled by posing the rhetorical question as to how those particular numbers were selected rather than (say) the hallmarks of "heavy" work under Reg. § 1567(2)—one is no more (or less) arbitrary than the other.

10. The ALJ was within his rights in disregarding Grindle's testimony about pain as not credible. *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (citations omitted) explains:

> The ALJ is allowed to weigh and consider evidence and make credibility judgments about evidence. The ALJ's credibility determinations concerning lay witnesses must be given great deference by this court. Such a credibility finding will not be overturned absent a finding that the determination was "patently wrong in view of the cold record before us."

But the issue of pain is not before this Court.

It is worth contrasting what Grindle actually said with what the ALJ said about what she said. Thus ALJ Drucker asked Grindle (R. 62–63):

Q  Do you ever go to a store for shopping?
A  Yes, the store is about a block.
Q  How far—how often do you go to the store?
A  Sometimes when I have to buy bread.
Q  About once a week, once a month, what?
A  Once every two weeks.

That can hardly be described as behavior that supports Dr. Triplett's opinion that Grindle can perform medium work for eight hours a day. ALJ Drucker also asked (R. 63):

Q  What's about the heaviest grocery bag, if any, you can lift up?
A  A quart of milk and a loaf of [bread].

It would take something approaching the miracle of the loaves and fishes to convert that loaf into Dr. Triplett's (and the ALJ's) "finding" that Grindle could lift the 50 pounds necessary to be able to perform medium work.

ALJ Drucker emphasizes that Grindle took the train. In fact, she said that she had taken the elevated train to get to the hearing (R. 51–52) and that she uses the elevated train or a bus to get to the doctor (R. 62).[11] As for the testimony that she goes to church, she testified that she walks "two blocks" to do so "[a]bout once a month" (R. 62). Church services there last only an hour (R. 65). Her reading, according to her testimony, merely extends to newspapers and to reading books "maybe about half an hour" a week (R. 68).

ALJ Drucker also distorts Grindle's testimony about her performing housework to support his findings. Here the record reads (R. 67–68):

Q  You cook?

**11.** In the hearing before the first ALJ, Grindle explained that she had no car and that she used public transportation (R. 41). Then she was asked:
    Q  Okay. Do you have any trouble taking the public transits?
    A  Well I usually go with someone.

A  Sometimes I cook.
Q  You dust?
A  I dust, I pick up around the house.
Q  You make the beds?
A  I make the beds.
Q  You do any washing of clothes or ironing?
A  No.

*  *  *  *  *  *

Q  You do any mopping?
A  Sometimes ... About every other day.

*  *  *  *  *  *

Q  Do you sweep at all?
A  Yes I sweep.... About three or four times a week.
Q  You do vacuuming?
A  I do vacuuming also.
Q  How often do you do that?
A  About once a week.

None of those activities comes close to supporting the asserted ability on Grindle's part to lift 50 pounds or to perform at any of the other required levels for medium work.[12]

■ Thus Grindle's testimony, while it does show that she performs some household work, goes to church once a month and takes public transportation on occasion, utterly fails to say what ALJ Drucker states that it says. It simply does not contradict the findings of the treating physicians. Merely because she can carry on some physical activity that sometimes exceeds sedentary behavior, that does not tell what she could do on the ongoing repetitive basis required to hold a job. Her ability to take care of herself is not the question. As *O'Connor v. Sullivan*, 938 F.2d 70, 74 (7th Cir.1991) states:

The question is not whether one can survive in a noninstitutional setting—feed oneself, socialize, etc.—but whether one can work.

Nothing in her testimony during the first hearing supports the theory that she can perform medium work.

**12.** Neither of course does the fact that she washes her dishes (R. 66).

Once again Grindle's ability to work must be at the medium level if she is to be adjudged as not disabled, and nothing in her testimony confirms that she has that ability. Thus the opinions of the treating physicians remain uncontradicted—except by the nonexamining physician's out-of-whole-cloth conclusions.

### Doppler Test

ALJ Drucker's only other citation of evidence to attack the credibility of the treating physicians was to the results of the consulting exam. There Dr. Gordon found that there was an absence of pulses in Grindle's legs (R. 139), and the contemporaneous examination found that she fatigued after one minute and ten seconds of exercise (R. 136). But what seemed to convince the ALJ (R. 14) was the results of a Doppler exam, which determined:

> There is no significant additional decrease in blood flow with exercise.

It is not clear from any of the evidence just what significance that has to the critical issues here. At most the Doppler test might have some bearing on Grindle's ability to walk, but there is no evidence in the record that it supports any finding that Grindle can lift 50 pounds or otherwise perform medium work.

And of course ALJ Drucker was not in a position to interpret the results of the Doppler test on his own. As *Whitney*, 695 F.2d at 788 says:

> And because an Administrative Law Judge as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony.

Diagnoses are for the doctors—not for the ALJ or Secretary or this Court. Neither the Appeals Council nor the ALJ has the authority to play doctor and make a medical evaluation of Grindle's condition (*Bauzo v. Bowen*, 803 F.2d 917, 926 (7th Cir.1986)). Certainly the ALJ may not make medical judgments that are not supported by the medical evidence in the record (see, e.g.,

*Lundquist v. Heckler*, 670 F.Supp. 781, 786 (N.D.Ill.1985)).

### Scope and Result of Review

At this review stage the question is whether there was substantial evidence to support the ALJ's conclusion. This Court is *not* to base its ruling on whether it agrees with the ALJ's finding or whether it might have reached another conclusion in the first instance. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1986) (per curiam) (citation omitted) states the universal rule:

> In reviewing the decision of the Secretary, we and the district court are obliged to review all the evidence contained in the record. However, we must accept the findings of the Secretary if supported by substantial evidence; we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary.

But in this instance there simply is no substantial evidence in the record to support ALJ Drucker's conclusions that Grindle can perform medium work and is therefore not disabled. When the layers of mischaracterization are peeled away, all that really supports that view is the evaluation of the nonexamining physician—which is itself without record support.[13] As *Whitney*, 695 F.2d at 789 ruled:

> Because there was little evidence contrary to the treating physician's conclusions, we hold that the ALJ erred in not according substantial weight to the medical reports and testimony of the [treating physician].

All that remains to be decided is whether this Court should remand the case to Secretary or reverse outright and order payment of benefits to Grindle. Section 405(g) confers judicial authority to affirm, modify or reverse Secretary's decision "with or without remanding the cause for a rehearing." As *Boyes v. Sullivan*, 901 F.2d 717, 722–23 (9th Cir.1989) (citations omitted) states:

> When the ALJ fails to point to clear and convincing reasons for rejecting the con-

---

13. D. Mem. 8 n. 6 points to differences between the RFC determinations of Drs. Yunez and Boon. In Secretary's universe the existence of findings that limit Grindle to no more than sedentary work in one instance and no more than light work in another somehow support the conclusion that she is capable of *medium* work!

clusion of the treating physician, or provide specific, legitimate reasons based on evidence for disregarding that conclusion, and when the administrative record is fully developed, benefits should be awarded.

And to the same effect *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989) (citations omitted) explains:

[W]e generally award benefits when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion. Remand is appropriate "where additional administrative proceedings could remedy defects"; but where remand would only delay the receipt of benefits, judgment for the claimant is appropriate.

Accord, *Bell v. Bowen*, 658 F.Supp. 533, 538–39 (N.D.Ill.1987).

Here the step five outcome is clear: If the ALJ had given the otherwise uncontradicted treating physicians' opinions even the slightest weighting to overbalance that of the nontreating physician, he would have come to the inescapable conclusion that under App. § 202.04 Grindle must be classified as "disabled" and is entitled to benefits. Because no useful purpose would be served by a remand to reach that inevitable result, it is appropriate to reverse Secretary's decision outright.

### Conclusion

There is no genuine issue of material fact in the record regarding Grindle's claim for disability. Two treating physicians concluded that Grindle could not perform the physical functions that would classify as medium work. No substantial evidence occupied the other side of the scales. Thus the evidence supports only a finding that Grindle is classified as disabled. This case is reversed, and Secretary is directed to establish a period of disability and award the benefits owed.