**John N. MULVENNA, Plaintiff,**

**v.**

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**No. 91 C 4578.**

United States District Court, N.D. Illinois, E.D.

June 2, 1992.

Thomas Nash, Chicago, Ill., for plaintiff.

Craig Oswald, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Mulvenna ("Mulvenna") claims that he was permanently disabled by an acute anterior wall myocardial infarction.[1] Secretary of Health and Human Services Louis Sullivan ("Secretary") denied Mulvenna's claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423.[2]

Mulvenna has appealed that decision and now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56, seeking reversal or remand. Secretary cross-moves for summary judgment. For the reasons stated in this memorandum opinion and order, both motions for final disposition are denied and the case is remanded for reconsideration of Mulvenna's theory that he is disabled by the combination of his heart condition and his special vulnerability to stress.

### Factual and Procedural Background

Mulvenna was born on September 16, 1932 and obtained a college degree in marketing (Administrative Record ("R.") 13).

---

1. That is defined in Stedman's Medical Dictionary ("Stedman's") 706–07 (5th Unabridged Lawyers' Ed.1982) as a "[s]udden insufficiency of arterial or venous blood supply due to emboli, thrombi, vascular torsion, or pressure that produces a macroscopic area of necrosis" of "an area of the heart muscle, usually as a result of occlusion of a coronary artery."

2. Further citations to the statute will simply take the form "Section ——". Pertinent regulations, all of which are found in 20 C.F.R. § 404, will be cited as "Reg. § ——".

He worked in the retailing business for 33 years (R. 117), most recently as store manager for general merchandise at a Sears store on Chicago's North Side (R. 35, 44). Mulvenna supervised 600 employees at that store (R. 13).

While in Florida on New Year's Day 1988, Mulvenna suffered an acute anterior wall myocardial infarction (see n. 1) that caused him to be hospitalized for ten days (R. 14). Mulvenna was also diagnosed as having a left ventricular aneurysm,[3] atherosclerotic heart disease,[4] acute periocarditis,[5] mild congestive heart failure [6] and ventricular tachycardia [7] (R. 14). Following his hospitalization Mulvenna underwent further testing and began a cardiac rehabilitation program (R. 14–15).

On May 13, 1988 Mulvenna applied to the Department of Health and Human Services ("HHS") for disability insurance benefits (R. 97–100). His application was denied both initially and on administrative reconsideration (R. 101–09). Mulvenna then sought a hearing (the "Hearing"), which took place on January 3, 1990 before Administrative Law Judge ("ALJ") James Lanter.

Documentary evidence presented to ALJ Lanter comprised 35 exhibits, principally doctors' reports and test results. Two of the doctors' reports were by Dr. Ronald Schreiber, Mulvenna's treating cardiologist in Chicago (R. 254, 269–70). Three witnesses testified: Mulvenna, Dr. David Abramson, a cardiologist who served as the ALJ's neutral medical advisor, and vocational expert Phillip Katch.

Mulvenna (through live testimony) and Dr. Schreiber (through written submissions) contended that Mulvenna was an un-

usually driven, high-strung person, so susceptible to stress that any work at all might trigger a devastating or even fatal renewal of the acute cardiac problems that he experienced in early 1988. Dr. Steven West, who treated Mulvenna during his initial hospitalization in Florida, also submitted a brief letter describing Mulvenna as "totally and completely disabled" by his myocardial infarction and "due to the stress associated with work" (R. 253).

Mulvenna described himself this way (R. 63):

> But the fact is no matter what my job was, if it was toll taker or a parking lot attendant or what, I would be the best damn toll taker or parking lot attendant in the world and I can't stop from doing that. And I would do everything I could to do that job to the utmost of my capacity. I don't know how [to] work any other way.

At the same time Mulvenna acknowledged that he maintained a fairly vigorous schedule of exercise (R. 65–66) and routine household chores (R. 64–65). He also admitted to doing a certain amount of driving around the Chicago metropolitan area at non-rush hours without encountering stress symptoms (R. 66–67), though he recalled an instance when he "had a problem" when driving at rush hour (R. 67).

Dr. Abramson testified that while the myocardial infarction had greatly reduced Mulvenna's cardiac capacity, he did not suffer from angina pectoris (R. 57–58). Dr. Abramson thought that Mulvenna's ability to handle routine exercise and chores undercut his argument about the dangers of work-related stress (R. 74–75). Dr. Abram-

---

3. Stedman's at 72 defines a "cardiac aneurism" as a "mural or ventricular aneurysm"; "thinning, stretching, and bulging of a weakened ventricular wall, usually as a result of myocardial infarction."

4. "[H]ardening of the arteries" (Stedman's at 136, referring to "arteriosclerosis," and then at 120, defining the latter).

5. "[I]nflammation of the pericardium ["heart sac"]" (Stedman's at 1053, under alternative spelling "pericarditis").

6. "(1) [M]echanical inadequacy of the heart so that as a pump it fails to maintain the circulation of blood, with the result that congestion and edema develop in the tissues ... (2) the resulting clinical syndrome consisting of shortness of breath, pitting edema, enlarged tender liver, engorged neck veins, and pulmonary rales" (Stedman's at 512).

7. "[R]apid beating of the heart, usually applied to rates over 100 per minute," which "origin[ates] in an ectopic focus in the ventricle" (Stedman's at 1406).

son therefore opined that Mulvenna was able to lift ten pounds in a work setting (R. 73–75), which corresponds to the definition of "sedentary work" as that term is defined in the regulations (Reg. § 404.-1567(a)).

Katch testified that more than 30,000 low-stress sedentary jobs existed in the region, including positions such as payroll clerk, personnel clerk, bookkeeping clerk and order clerk (R. 82).[8] Katch said that Mulvenna's skills were transferable to those jobs (R. 81) and Mulvenna agreed (R. 94), although he continued to maintain that stress disabled him.

Before the Hearing Mulvenna had asked for a continuance from January to May so that Dr. Schreiber could testify. ALJ Lanter had denied that request. After brief discussion of the same issue at the Hearing, ALJ Lanter reiterated his decision to proceed without live testimony by Dr. Schreiber (R. 32–33).

On March 12, 1990 ALJ Lanter issued his ruling (R. 11–19) finding that Mulvenna was not entitled to disability benefits. Mulvenna appealed ALJ Lanter's decision to the HHS Appeals Council, which affirmed (R. 2–4). Because Secretary has delegated his review powers to the Council, its decision automatically became Secretary's final decision (*Arbogast v. Bowen*, 860 F.2d 1400, 1402 (7th Cir.1988)). Mulvenna then filed his Complaint in this District Court appealing that decision.

■ This Court reviews the decision of the Appeals Council and not that of the ALJ (*Young v. Secretary*, 957 F.2d 386, 388 (7th Cir.1992)). In this case, however, the logic followed by the Appeals Council precisely tracks the logic of ALJ Lanter's decision, so for the most part this opinion will refer directly to the ALJ's ruling rather than to the Council's letter of affirmance (see *Arbogast*, 860 F.2d at 1402–03).

### Rule 56 Principles

Rule 56 requires this Court to rule in the moving party's favor if "there is no genu-

ine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Any factual issue is deemed "genuine" when the record contains evidence sufficient to persuade a reasonable factfinder to adopt the view of either party (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir.1991)), and such an issue is deemed "material" when it is outcome-determinative under the applicable substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

Rule 56 principles require the movant to establish the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). In evaluating whether a movant has met that burden, the court must draw all "reasonable inferences, not every conceivable inference" in favor of the nonmovant (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

Where as here cross-motions are involved, the court must extend the benefit of the doubt to each party when considering the other's motion—a dual perspective that sometimes compels the denial of both motions. But (just as in most other Social Security cases) that potential problem does not arise here, where Rule 56 merely provides the mechanism for a trial court to decide what is in substance an appeal. Like any other appeal, this one requires the application of law (Social Security statutes and regulations) to facts (the undisputed administrative record). Relevant factual disputes tend not to arise when the cross-motions pose common questions of law that turn on undisputed facts.

### Statutory and Regulatory Framework

Section 1382c(a)(3)(A) defines disability as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental im-

---

**8.** Katch's testimony referred to "65,000" jobs in one of those categories, which the ALJ's opinion instead reflected (it would seem accurately) as "6,500" (R. 14).

pairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

*Young,* 957 F.2d at 389 (case citations omitted) explains the five-step inquiry that guides Secretary's evaluation of a disability claim:

1) [I]s the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991). The claimant bears the burden of proof in steps one through four. If that burden is met, the burden shifts to the Secretary to prove that the claimant cannot perform other work in the economy.

Step 3 requires Secretary to assess whether the claimant has an impairment specified in the Listing of Impairments (Part 404, Subpt. P, App. 1). Impairments found in the Listing mandate a finding of disability because they are "severe enough to prevent a person from doing any gainful activity" (Reg. § 404.1525(a)). Secretary must predicate such a determination on either of two conclusions: that claimant's impairment corresponds directly to the requirements spelled out in the Listing or that claimant's impairment (or combination of impairments) is "medically equivalent" to a Listing although it does not match up precisely with the regulatory criteria (Reg. § 404.1526(a)). Secretary must resolve the question of medical equivalency vel non on the basis of medical evidence (Reg. § 404.-1526(b); *Honeysucker v. Bowen,* 649 F.Supp. 1155, 1158 (N.D.Ill.1986)).

Step 5 requires Secretary to determine the claimant's "residual functional capacity" ("RFC"): whether he or she is physically able to perform "sedentary," "light," "medium," "heavy" or "very heavy" work as those terms are defined by Reg. § 404.-1567. Secretary also assesses the claimant's age, education and work experience, known collectively as his or her "vocational factors" (Reg. §§ 404.1563–.1565). Then Secretary slots the RFC and vocational-factor conclusions into the grid (Medical Vocational Guidelines of Part 404, Subpt. P, App. 2). For every permutation of RFC and the various vocational factors, the grid specifies whether or not a claimant will be deemed disabled.

### *Standard of Review*

District courts "decide[ ] disability cases ... by reviewing the final decision of the Secretary to ensure that it is supported by substantial evidence" (*Young,* 957 F.2d at 388). "Substantial evidence" means (*Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Young,* 957 F.2d at 389 similarly confirms that "[s]ubstantial evidence may be something less than the greater weight or preponderance of the evidence." As the Court of Appeals has said (*Meredith v. Bowen,* 833 F.2d 650, 653 (7th Cir.1987)):

[W]e may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ.

*Young,* 957 F.2d at 393 also teaches that "within reasonable limits, the reason for rejecting evidence must be articulated if there is to be meaningful appellate review." Thus Secretary must explain both

why the evidence supporting a ruling is substantial in the absolute sense (why it is persuasive on its own terms) and in the relative sense (why the remainder of the evidence is not persuasive).

*Decision and Reasoning of ALJ Lanter*

As he went through the five-step inquiry, ALJ Lanter concluded that Mulvenna:

1. is not employed;

2. suffers from a severe impairment—specifically, the limited cardiac capacity resulting from his myocardial infarction and related ailments;

3. does not meet or exceed an impairment as described in the Listing because neither angina nor any other condition is present;

4. cannot resume his former work as manager of a large retail store; and

5. retains the RFC to do sedentary work, with a significant number of sedentary jobs being available to him in the regional economy.

Mulvenna and Secretary part company at step 3. In deciding that Mulvenna does not meet or exceed a listed impairment, ALJ Lanter relied both on testimony to that effect by Dr. Abramson (R. 14) and on the belief that Mulvenna himself "consistently denied angina pectoris" (R. 17).

At step 5 ALJ Lanter credited the testimony of Dr. Abramson that Mulvenna could perform sedentary work without supervisory responsibilities (R. 17). Relatedly the ALJ rejected Dr. Schreiber's opinion that Mulvenna's susceptibility to stress made any work at all a hazard to his health (*id.*):

The Administrative Law Judge attributes greater weight to Dr. Abramson's opinion than that of Dr. Schreiber's because the treating doctor's physician-patient relationship has caused him to overstate the degree to which the claimant can tolerate stress. The claimant is able to tolerate day-to-day stress and traffic conditions as evidenced by his testimony that he drove from his home in Orland Park to Loyola Hospital to obtain Exhibit 33 with no problem and has never experienced any difficulty while driving.[9]

In that respect ALJ Lanter also discredited Mulvenna's own testimony on the likely effects of work-related stress (*id.* (emphasis in original)):

The Administrative Law Judge does not credit the claimant's testimony that he would be unable to tolerate the stress of *any* work. This testimony is contradicted by the medical advisor's opinion, as well as the claimant's own testimony of daily activities, which includes tolerating the stress of traffic conditions.

At step 5 ALJ Lanter also found that Secretary had satisfied his burden of demonstrating that Mulvenna could perform a significant number of "routine stress sedentary jobs" that existed in the regional economy (R. 18). In support of that conclusion the ALJ cited the testimony of vocational expert Katch.

*Evaluation of Secretary's Decision*

Mulvenna focuses on two alleged errors by ALJ Lanter: the refusal to continue the Hearing until a time when Dr. Schreiber could testify in person, and the finding that Mulvenna does not have angina. Mulvenna may or may not also mean to argue that Secretary erred by discrediting his stress theory—on that score the briefs are ambiguous. This opinion assumes that he does intend to press that third theory, and so it discusses each of the three (rather than two) alleged errors.

*1. Continuance*

■ Under Reg. § 404.936(b) an ALJ must grant a continuance on a showing of

9. [Footnote by this Court] Here ALJ Lanter failed to mention Mulvenna's comment to the effect that he once "had a problem" while driving at rush hour (R. 67). Mulvenna did not go into any detail, and it was a permissible inference (though not the only possible one) for ALJ Lanter to draw that the unspecified "problem" was nothing more than the agitation that any person experiences while driving at rush hour, rather than actual angina pains. But for the ALJ to leap from that inference to a *factual* finding that Dr. Schreiber's views were colored by a pro-patient bias—the ALJ's quoted finding of causation—was really out of order. This opinion treats with that issue at greater length later on.

"good cause" by the claimant. Good cause is automatically found in two circumstances not present here (Reg. § 404.-936(c)). Then a catchall provision (Reg. § 404.936(d)) permits but does not require a finding of good cause under other circumstances. That provision says the ALJ should consider:

your [the claimant's] reason for requesting the change, the facts supporting it, and the impact of the proposed change on the efficient administration of the hearing process. Factors affecting the impact of the change include, but are not limited to, the effect on the processing of other scheduled hearings, delays which might occur in rescheduling your hearing, and whether any prior changes were granted to you. Examples of such other circumstances, which you might give for requesting a change in the time or place of the hearing, include, but are not limited to, the following:

.... (4) A witness who will testify to facts material to your case would be unavailable to attend the scheduled hearing and the evidence cannot be otherwise obtained[.]

Mulvenna must rely on that catchall provision, if anything.

ALJ Lanter asked Mulvenna's counsel what Dr. Schreiber's live testimony could supply that his written report did not. Counsel replied (R. 32):

I imagine he'd be more vocal, with, with it, other than the letter, Judge. A letter is one thing, the actual testimony of witnesses are, are another, but I do not know. The basic facts are set out in the letter.

ALJ Lanter then proceeded with the Hearing, based on what looks for all the world like counsel's concession that Dr. Schreiber's live testimony would contribute no material facts (the just-cited test of Reg. § 404.936(d)(4)) that were not presented in his letter.

Through a new lawyer, who represents Mulvenna on this appeal but did not represent him at the Hearing, the now-advanced argument is that Dr. Schreiber would have contributed essential testimony on the pres-

ence of angina pectoris and the nature of Mulvenna's response to stress. New counsel offers this creative excuse for the concession at the Hearing (Mulvenna Mem. 16):

[T]he attorney could not reasonably be expected to predict what Dr. Schreiber, an experienced treating cardiologist with an extensive and impressive background and a particular knowledge of claimant's treatment course, would testify at the hearing.

Any lawyer in any adversary proceeding is expected—indeed required—to be capable of explaining to the court at least in rough terms the hoped-for substance of a proposed witness' testimony. Reg. § 404.-936(d)(4) plainly requires the claimant to proffer such an explanation when the ALJ asks for one. Here the lawyer said, "I do not know." In light of that answer, it could not possibly constitute reversible error for the ALJ to proceed without Dr. Schreiber's testimony. If the attorney "could not reasonably be expected to predict" the contents of the testimony, then ipso factor ALJ Lanter "could not reasonably be expected" to grant the continuance.

Mulvenna also argues (Mem. 16–17) that the need for Dr. Schreiber's testimony did not become evident until well into the Hearing, when some confusion arose about whether Mulvenna met the regulatory definition of angina pectoris. Yet the resolution of a request for continuance obviously must be tested on appeal in light of the record before the ALJ at the time the request is posed (cf. *Andrews v. Bowen*, 848 F.2d 98, 101–02 (7th Cir.1988), holding in a somewhat different context that an ALJ has no duty to develop the record further "without a reason to expect that the results would differ"). ALJ Lanter's decision to proceed was clearly reasonable in light of the record at the time he made it.

If any basis for correcting that decision became evident later in the Hearing, Mulvenna's counsel should have renewed the request for a continuance. Reg. § 404.-936(a) permits an ALJ to adjourn, postpone or reopen a hearing to obtain additional evidence "at any time before he or she

notifies the parties of a hearing decision." There was no renewal of the request on Mulvenna's behalf. ALJ Lanter could not have erred by failing to grant a continuance that was never requested.

One final point on this issue: Because nobody involved in the litigation seems even to have noticed the existence of Reg. § 404.936 [10], nobody has offered any meaningful input on the standard of review for decisions to grant or not to grant a continuance. Nor does the only reported case construing the regulation (*Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir.1990)) supply any help. Secretary evidently favors an "abuse of discretion" standard, which is what the Appeals Council applied in upholding the decision (R. 2)—albeit without reference to the regulation.

It is not necessary to decide the standard-of-review question here. Given Mulvenna's failure of any real offer of proof at the beginning of the Hearing and his failure to renew the issue afterwards, ALJ Lanter's decision must be affirmed under any conceivable standard of review.

### 2. Angina

Mulvenna asserts that he satisfies the regulatory description of ischemic [11] heart disease with chest pain of cardiac origin (Reg. Part 404, Subpt. P, App. 1, Listing 4.04). ALJ Lanter found no angina present and proceeded on to the fourth and fifth steps of the analysis.

To prove that claim, Mulvenna must satisfy the requirements spelled out in the Listings. According to Listing 4.00 D (emphasis in original):

*Ischemic heart diseases* may result in a marked impairment due to chest pain. Description of the pain must contain the clinical characteristics as discussed under 4.00E. In addition, the clinical impression of chest pain of cardiac origin must be supported by objective evidence as described under 4.00 F, G, or H.

Listing 4.00 E (emphasis in original) describes the clinical characteristics that must be present:

*Chest pain of cardiac origin* is considered to be pain which is precipitated by effort and promptly relieved by sublingual nitroglycerin or rapid-acting nitrates or rest. The character of the pain is classically described as crushing[,] squeezing, burning or oppressive pain located in the chest. Excluded is sharp, sticking or rhythmic pain.

As Listing 4.00 D says, a claimant must also proffer objective evidence from an electrocardiogram (4.00 F), exercise testing (4.00 G) or an angiogram (4.00 H). But Listing 4.00 G.4 specifies:

Where the evidence includes the results of a treadmill exercise test, this evidence is the primary basis for adjudicating claims under 4.04.

Listing 4.04 A describes the sort of treadmill results that confirm the presence of ischemic heart disease. Other forms of clinical evidence are considered only "[i]n the absence of a report of an acceptable treadmill test (see 4.00G)" (Listing 4.04 B).

ALJ Lanter wrote that Mulvenna has "consistently denied angina pectoris" since leaving the hospital in 1988 (R. 17). That was inaccurate. Mulvenna did testify to a certain amount of chest pain that he considered to be anginal, which occurred "pretty regularly if I over tax myself at exercise" (R. 68). As recently as a few weekends before the Hearing he experienced a "sharp feeling in the chest" when he "over did it" while exercising (R. 48). Mulvenna testified that he felt the pain rarely; that it went away "in just a matter of minutes" if he rested; and that "I don't even take nitroglycerin when it happens, that's how mild it is" (*id.*) Later he reiterated (R. 68):

[T]he fact is I hardly have angina, I hardly have chest pain.... It just, it's very irregular, very sporadic.

---

**10.** No reference to the regulation appears in the ALJ's decision, the letter of affirmance from the Appeals Council or either party's briefs.

**11.** "Relating to or affected by ischemia," which is defined in turn as "Hypoemia; local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply" (Stedman's at 728).

So ALJ Lanter was no more than partially right when he described Mulvenna's "consistent[ ] den[ial]" of angina pectoris. But Mulvenna Mem. 10 misses the mark as well when it says:

While it is clear from the evidence of the claimant himself, the treating cardiologist Schreiber, the medical advisor Abramson, and the decision of the ALJ that the claimant has suffered from relatively little angina, it is (importantly) equally clear from all of these same sources that the claimant does suffer from cardiac chest pain known as angina[.]

As the ensuing discussion reflects, none of those sources supports the proposition that Mulvenna suffers from angina pectoris *as defined in the regulations*. ALJ Lanter's error therefore was harmless.

■ *a. Mulvenna.* All that Mulvenna himself testified to was a "mild" but "sharp" pain brought on by excessive exercise. That description hardly matches the "clinical impression" required by Listing 4.00 D of "crushing[,] squeezing, burning or oppressive pain." That same listing specifically excludes "sharp" pain—the kind that Mulvenna says he feels (see *Atterberry v. Secretary,* 871 F.2d 567, 571 (6th Cir.1989), describing important clinical differences between "sharp" pain and classical angina pain).

Listing 4.00 E does not require any specified *frequency* or *duration* of angina pain (*Knipe v. Heckler,* 755 F.2d 141, 147 (10th Cir.1985), quoting *Blumberg v. Heckler,* 598 F.Supp. 1250, 1261 (S.D.Fla.1984)). But the Listing does require a certain *kind* and *severity* of pain (*Atterberry,* 871 F.2d at 571), neither of which is evidenced by Mulvenna's own testimony.

*b. Dr. Abramson.* Dr. Abramson testified that Mulvenna had offered objective evidence adequate to prove ischemic heart disease under Listing 4.04 B.7 or 4.04 B.8 (R. 58). But he also recognized that such evidence was irrelevant unless Mulvenna also had angina as defined in Listing 4.00 E, "and that's the problem here" (*id.*) Dr. Abramson noted that Mulvenna had suf-

fered angina before his heart attack (see R. 45). Then he added (R. 57):

The claimant has been very careful in what he's stated and he's [sic] says that he does not have any pain, any type of symptom like that, now.

In short, Dr. Abramson never stated—clearly or otherwise—that he believed that Mulvenna suffered from angina within the meaning of the regulations.

Toward the end of the Hearing Dr. Abramson did note that the Listing "doesn't mention the degree of angina, just someone who has angina" (R. 69). Mulvenna portrays that statement as a belated recognition that he satisfied the definition of Listing 4.00 E (Mulvenna Mem. 12–13). Not so. Dr. Abramson never reversed his earlier unmistakable conclusion that Mulvenna failed to satisfy the Listing.

*c. Dr. Schreiber.* Dr. Schreiber reported in October 1988 that Mulvenna suffered from angina pectoris two to three times a week, 15 minutes at a time (R. 247–49). But Mulvenna's cardiac condition later improved. Just days before the Hearing Dr. Schreiber wrote (R. 270):

In summary, I cannot argue that John is disabled because of the presence of severe symptoms of angina pectoris (chest pain) or of congestive heart failure.

That statement implied that Mulvenna suffers from some mild angina pain at worst. Nowhere in the letter did Dr. Schreiber ever say outright that Mulvenna suffered from any angina pain at all.

*d. ALJ Lanter.* Mulvenna Mem. 13–14 depicts ALJ Lanter as accepting the existence of angina pectoris but denying its legal import. But in fact all that the ALJ did was to note Mulvenna's own reports of chest pain as well as Dr. Schreiber's assessment of that pain. He never stated or implied that Mulvenna suffered the sort of serious pain described in Listing 4.00E.

In short, substantial evidence supported ALJ Lanter's conclusion that Mulvenna did not meet the threshold requirement for a finding of disability under Listing 4.04.[12]

---

**12.** That conclusion makes it unnecessary to re-

solve the parties' dispute over the medical evi-

**334**

Mulvenna has lost on the second issue as well as the first.

### 3. Stress

■ ALJ Lanter concluded his opinion by finding that Mulvenna could do sedentary work, rejecting his argument about the likely effects of work-related stress. It is worth observing at the outset that the combination of a weakened heart and high susceptibility to work-related stress *may* support a finding of disability (*Schmidt v. Sullivan*, 914 F.2d 117, 119 (7th Cir.1990), citing *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir.1984)).

It is not clear whether Mulvenna meant to waive the stress argument on appeal. Mulvenna Mem. 10 does not raise the argument, declaring instead that the "clear" evidence of angina makes the stress issue "fascinating yet unnecessary to the resolution of the ... claim" (Mulvenna Mem. 10). But Mulvenna R.Mem. 4 essentially resuscitates the argument by suggesting that the stress-plus-weakened-heart combination represented the *equivalent* of a listed impairment. This opinion will assume that Mulvenna intended to argue the stress theory in the alternative, rather than abandoning it.

There is no dispute that Mulvenna is *physically* capable of sedentary work: Dr. Abramson thought he could lift up to ten pounds and Dr. Schreiber actually thought he could lift up to 30 (R. 17). What is in dispute is whether Mulvenna is too stress-prone to handle even a sedentary job without the risk of renewal of his acute heart trouble. Dr. Schreiber, the only source of any medical evidence supporting Mulvenna's position, sent the ALJ several articles describing the relationship of stress to heart trouble, and he added in his cover letter (R. 269–70):

I feel that John may have the personality and the anxiety level of the individuals that are referred to in these articles. I feel it is possible if John is required to return to work that a bad medical outcome could result to him..... [S]ince I know John quite well I feel that he is at an increased risk of suffering a cardiac event in the future if he is required to return to work. There is medical evidence to support the belief that some individuals may be at risk for subsequent cardiac events if they are placed in what they feel are stressful conditions.

Mulvenna also testified that he felt he could not handle the stress of even a sedentary job. Thus ALJ Lanter was obligated to articulate his reasons for rejecting both Dr. Schreiber's opinion and Mulvenna's testimony.

ALJ Lanter discussed Mulvenna's susceptibility to stress only after having stated (R. 17):

He does not have any impairments equalling the Listings since no other condition is present.

At that point he went on (*id.* (emphasis added)):

Since the claimant's status post myocardial infarction condition does not meet or equal any listing, an assessment of his residual functional capacity is necessary.

That appears to be a step 5 type of approach, rather than the appropriate one under which a claimant's RFC depends entirely on the severity of his or her impairments, which are earlier determined at step 3. Ability "to respond appropriately to ... work pressures" (Reg. § 404.1545(c)) figures in the RFC analysis only when the claimant has a mental impairment. Mulvenna denied any such impairment, and ALJ Lanter agreed (R. 13).

■ ALJ Lanter should instead have made an explicit finding at step 3 as to whether the combination of Mulvenna's weakened heart with his susceptibility to stress formed the medical equivalent of a

---

dence under Listings 4.04 A or 4.04 B. Secretary Mem. 8 contends that all of the treadmill tests fail the requirements of Listing 4.04 A, so that Mulvenna is not entitled to disability benefits even if he has angina pectoris. One treadmill report, though, appears to suggest that Mulvenna met the requirements of Listing 4.04 A.5 (R. 250). Thus a finding of angina pectoris would trigger a remand so that an ALJ could evaluate the treadmill evidence.

Listing under Reg. § 404.1526.[13] Then and only then would it have become proper to discuss the impact of Mulvenna's stress-related "impairment" on his RFC.

To determine whether ALJ Lanter's error in failing to deal with the subject at step 3 was harmless, this opinion must look at the substance of his discussion of the stress issue at step 5. If that analysis actually covered the bases that would have been required at step 3, there would be no point in remanding on this issue if the only result would be Secretary's reaching—albeit in a different format—the same preordained result.

ALJ Lanter did effectively reject the "medical equivalency" argument on the basis of medical evidence as required by Reg. § 404.1526(b): he relied on the opinion of medical consultant Dr. Abramson, something specifically authorized by that regulation. In that respect the ALJ credited Dr. Abramson's conclusion that Mulvenna could handle a low-stress job and rejected Dr. Schreiber's opinion that Mulvenna could not. ALJ Lanter considered the neutral doctor more reliable because he found that Dr. Schreiber's views were skewed by sympathy for the patient (R. 17 said "the treating doctor's physician/patient relationship has caused him to overstate the degree to which the claimant can tolerate stress").

■ Secretary offers *Reynolds v. Bowen*, 844 F.2d 451, 454–55 (7th Cir.1988) for the proposition that the treating physician's views may be disregarded pretty much automatically on grounds of presumed bias. As this Court has said in earlier cases, the law is neither so simple nor so pro-Secre-

tary. Both the case law and Secretary's own Social Security Ruling ("SSR") (incorporated in the Amendments to 20 C.F.R. Parts 404 and 416, 56 Fed.Reg. 36,932 (1991)) confirm the general rule that "the ALJ must normally give extra weight to a treating physician's evaluation" (*Grindle v. Sullivan*, 774 F.Supp. 1501, 1509–10 (N.D.Ill.1991)). It is improper for an ALJ to disregard that rule based only on an unsupported and conclusory declaration that the treating physician is biased—especially in this case, where the treating physician's statement reflected a professional and even-handed objectivity, including the explicit acknowledgement that to somebody not familiar with Mulvenna's case his daily activities might seem to belie a claim of disability (R. 270).[14] Instead an ALJ must reject the treating physician's views for reasons that comport with the case law and the SSR. ALJ Lanter did not do so, so that his decision to discredit Dr. Schreiber's views on the ipse dixit basis that the ALJ employed must be reversed.

Because the ALJ offered no other reason for discrediting Dr. Schreiber's opinion, the evidence poses a classic jump ball situation: One physician finds the stress factor disabling, the other does not, and neither bases his opinion on any well-documented clinical findings present in the record. It would be equally improper for this Court to resolve that standoff in the first instance—it must rather remand the case for proper consideration of the medical-equivalency issue at step 3.

One last issue requires consideration on remand. ALJ Lanter rejected Mulvenna's own testimony that he was too stress-prone

---

**13.** That was obviously the argument proffered by Mulvenna and Dr. Schreiber, who began his letter by saying that "[t]he reasons for my opinion are somewhat complex and differ substantially from the usual guidelines regarding disability" (R. 269). It is true that Dr. Schreiber also relied on the results of a stress test, but based on the discussion earlier in this opinion of the angina factor alone, it is clear that such reliance was misplaced.

**14.** It is noteworthy here that the absence of Dr. Schreiber (an Associate Professor of Clinical Medicine, Section of Cardiology, at Loyola University Medical Center) from the Hearing does

have at least one element of relevance: This is not a situation in which the ALJ had the opportunity to observe the witness' demeanor, so as to trigger the normal rule that the trial judge's determinations as to credibility of witnesses (including expert witnesses) will be honored. Here the evidence from Dr. Schreiber is purely a paper record, so that this Court is in an equally good position to evaluate credibility in terms of any bias that it evidences. And it is plain that the ALJ's adverse determination in that respect reflects only a predilection at odds with the controlling SSR.

to do sedentary work, crediting Dr. Abramson's objective opinion over the claimant's subjective allegations (R. 17; in support of such a rationale, see, e.g., *Veal v. Bowen*, 833 F.2d 693, 698–99 (7th Cir.1987)). But in the next paragraph of his opinion the ALJ also appeared to cite his own opinion of Mulvenna's likely reaction to stress on the job (R. 17).

*Schmidt*, 914 F.2d at 118 teaches that an ALJ must rely on medical evidence and not on the ALJ's layperson intuition when assessing how a claimant's daily activities reflect his or her susceptibility to work-related stress. On remand the ALJ must take care not to let his own amateur evaluation of the significance of Mulvenna's ability to handle exercise and chores ("the temptation to play doctor," as *Schmidt, id.* put it) influence the resolution of this issue.

### Conclusion

Neither party has proved an entitlement to a judgment as a matter of law. This case is remanded to Secretary with instructions to give full consideration to the possibility that Mulvenna's susceptibility to stress, when combined with his weakened heart, forms the medical equivalent of a listed impairment.