Janice OSHKESHEQUOAM, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of Social Security, Defendant.

No. 02–3282.

United States District Court, C.D. Illinois, Springfield Division.

July 31, 2003.

Donald J. Hanrahan, Springfield, IL, for Plaintiff.

James A. Lewis, Office of U.S. Attorney, Springfield, IL, for Defendant.

### *OPINION*

RICHARD MILLS, District Judge.

Plaintiff has filed multiple applications with the Social Security Administration seeking supplemental security income and disability insurance benefits.

Her claims of disability have previously been heard by three administrative law judges, one district court judge, and a three judge panel of a court of appeals.

This is the sixth and, hopefully, final chapter.

## I. PROCEDURAL BACKGROUND

On December 28, 1995, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a & § 1382c. On February 28, 1996, Plaintiff filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. § 416(i) & § 423.[1] Defendant denied Plaintiff's applications initially and upon reconsideration. Accordingly, Plaintiff sought further review.

After conducting a hearing, Administrative Law Judge ("ALJ") Lyle E. Lipe denied Plaintiff's applications for SSI and DIB on February 14, 1997. Thereafter, both the Appeals Council and United States District Judge Jeanne E. Scott, Central District of Illinois, denied Plaintiff's request for a review of ALJ Lipe's decision.

However, the United States Court of Appeals for the Seventh Circuit reversed and remanded Defendant's decision. *Oshkeshequoam v. Apfel,* 210 F.3d 375, 2000 WL 328123 (7th Cir.2000). Specifically, the Seventh Circuit reversed and remanded "[b]ecause the ALJ appears to have ignored evidence from the only examining physician to offer an opinion on [Plaintiff's] lifting ability...." *Id.* at *2.

On remand, ALJ Barbara J. Welsch conducted another evidentiary hearing and on August 10, 2001, issued a decision in which

---

**1.** On September 22, 1995, Administrative Law Judge Gerald J. Rickert denied Plaintiff's May 31, 1994, and June 23, 1994, applications for SSI and DIB. Plaintiff did not seek judicial review of this decision; rather, she filed these new applications with the Social Security Administration which are relevant to this case.

she concluded that Plaintiff was not disabled through her fifty-fifth birthday because she retained the Residual Functional Capacity ("RFC") to perform a significant number of jobs which exists in the economy. ALJ Welsch did, however, conclude that, after she turned fifty-five years of age, Plaintiff was disabled pursuant to the medical-vocational guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.02. Thereafter, the Appeals Council denied Plaintiff's request for review of ALJ Welsch's denial of her applications for SSI and DIB prior to her fifty-fifth birthday.

Therefore, Plaintiff commenced the above-captioned case seeking review of Defendant' decision pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). Herein, Plaintiff alleges that she is disabled due to carpal tunnel syndrome in both of her hands and due to her back pain, that her onset date for her disability is July 19, 1995, and that Defendant erred in denying her applications for SSI and DIB for the applicable period prior to her fifty-fifth birthday.

## II. FACTS

Plaintiff was born on May 11, 1944, and was fifty-one years of age at the time when she claims that she became disabled. Plaintiff's past vocational experience consists of work as a house manager, care giver, packager, bakery worker, clerical work, counter help, and housekeeping. Her formal education ceased after she completed the tenth grade.

### A. *MEDICAL EVIDENCE*

In 1976, Plaintiff underwent a laminectomy and spinal fusion surgery. In 1992, Plaintiff was diagnosed with status post-laminectomy at L5 and spondylolisthesis (forward slippage of the lower lumbar vertebrae on to the sacrum). There was also evidence of degenerative disc disease with associated end plate and facet degenerative changes.

In July 1992, Dr. John G. Meyer performed carpal tunnel surgery on Plaintiff's left hand. In January 1993, Dr. Meyer opined that Plaintiff should be limited to do a one arm job if her employer was able to make such a work consideration. In November 1995, Dr. Clifford Lynch repeated the carpal tunnel surgery on Plaintiff's left hand, and in December 1995, he performed carpal tunnel surgery on Plaintiff's right hand. After this second surgery, Dr. Lynch reported that Plaintiff had done extremely well but indicated that she would not be able to return to work for two or three months. Dr. Lynch later indicated that Plaintiff should remain off of work until April 1996 because of her carpal tunnel surgery and opined that she could not lift or carry anything with her left hand.

In February 1996, Plaintiff began receiving treatment for her back pain from Dr. David W. Mack. An MRI performed that month revealed moderate diffuse L3–4 and L4–5 disc bulges, mild spondylolisthesis L5 on S1, moderate bilateral L3–4 and very prominent bilateral L4–5 and L5–6 facet joint hypertrophic changes, and post operative changes at L5. After reviewing the MRI, Dr. Mack opined that Plaintiff was unable to tolerate sitting or standing for more than fifteen minutes at a time, and he restricted her lifting to five pounds on a repetitive basis.

Later that same month, Dr. Edward A. Trudeau examined Plaintiff. After examination, Dr. Trudeau concluded that Plaintiff had left L5 radiculopathy-mild in electroneurophysiologic testing characterization consistent with the quite correct clinical suspicions of Dr. Mack; no evidence of other lumbosacral radiculopathy currently; no evidence of entrapment

neuropathy currently; and no evidence of lumbar plexopathy currently.

In July 1996, Dr. Vittal Chapa examined Plaintiff at the request of a state agency. Dr. Chapa noted that Plaintiff suffered from low back pain, had a history of lumbar disc disease, and status post bilateral carpal tunnel surgery. Dr. Chapa opined that Plaintiff did not have any definite nerve root compression, that there was no evidence of paravertebral muscle spasms, that her straight leg raising test was negative, and that she could perform both fine and gross manipulations with both hands.

Later that same month, Dr. Mack examined Plaintiff and reported tenderness in her low back and positive straight leg raising to 80 degrees on the left. An MRI in August 1996, revealed a worsening diffuse disc bulge and focal protrusion at L3–4, minimal diffuse disc bulge at L4–5 of uncertain clinical significance, grade I spondylolisthesis L5 on S1, and very prominent bilateral facet joint hypertrophic changes L4–5 and L5–S1 with the appearance of a bone fusion at these levels. On August 27, 1996, Dr. Mack opined that Plaintiff was permanently and totally disabled and was unable to work.

During a follow-up visit in October 1996, Dr. Mack noted that Plaintiff had tenderness of her neck and shoulders and had low back and bilateral leg tenderness. She had negative straight leg raising, but she had decreased reflexes of the lower extremities. In April 1997, Dr. Mack wrote a letter in which he again opined that Plaintiff was permanently and totally disabled and was unable to work. In addition, Dr. Mack stated that he believed that Plaintiff was unable to tolerate sitting and standing for more than five minutes at a time and was unable to bend, stoop, push, or pull.

In March 1998, detailed nerve conduction studies performed by Dr. Trudeau on Plaintiff's lower extremities were bor-derline low normal. There was left L5 radiculopathy—moderately sever in electroneurophysiologic testing characterization—increased in comparison to previous study; no evidence of other lumbar or sacral root lesions currently; no evidence of entrapment neuropathy currently; and no evidence of left lumbar plexopathy currently.

In April 1998, Dr. Mack noted that Plaintiff continued to suffer low back and hip pain and that her straight leg raise testing was positive. Dr. Mack also noted that X-rays revealed spondylolisthesis with spondylosis, and he recommended decompression surgery. A May 1998 lumbar myelogram and computed tomography showed moderate diffuse disc bulge at L2–3 and L3–4 and a mild diffuse disc bulge at L4–5. Her spondylolisthesis had progressed from grade I to I–II; however, no severe spinal stenosis or nerve root compression was identified.

In May 1998, Dr. M.L. Mehra examined Plaintiff and reported that she demonstrated normal muscle tone, coordination, strength, gait, and deep tendon reflexes.

In June 1998, Dr. Mack performed decompression surgery on Plaintiff's back, i.e., decompression of L3 through S1, posteriorly with disc removal at L3–4 and L4–5.

In November 1998, Plaintiff sought treatment for back pain following an automobile accident in which she was involved. In December 1998, Dr. Mack administered an epidural injection to Plaintiff for her back pain resulting from the automobile accident.

In January 1999, Dr. Richard T. Bilinsky reviewed the medical record and examined Plaintiff at the request of a state agency. Dr. Bilinsky noted that Plaintiff's range of motion of both hips was decreased, that her straight leg raising was

accomplished to 45 degrees on the right and 40 degrees on the left; that there was evidence of paraspinal muscle spasm in the lumbar region and also some muscle atrophy; and that her range of motion of the thoracolumbar spine was decreased. Nevertheless, Dr. Bilinsky noted that Plaintiff walked with a normal gait and had no difficulty performing orthopedic maneuvers, and she did not need the assistance of any devise to aid her ambulation.

In February 1999, a state agency physician reviewed Plaintiff's medical file and concluded that Plaintiff retained the RFC to perform medium work with occasional postural limitations. Specifically, the state agency physician concluded that Plaintiff was able to carry twenty-five pounds frequently and fifty pounds occasionally; he further found that Plaintiff could sit and stand/walk about six hours each in an eight hour work day. Finally, the state agency physician concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.

In March 1999, Plaintiff fractured her left arm when she fell off of a step ladder while attempting to move a houseplant.

In April 1999, state agency physician Dr. June M. Pardo reviewed Plaintiff's medical file and reached conclusions similar to that of the other state agency physician. However, Dr. Pardo found Plaintiff's limitations to be greater. Dr. Pardo concluded that Plaintiff remained capable of lifting and carrying only ten pounds frequently and twenty pounds occasionally. Later that month, Plaintiff underwent an open reduction and internal fixation for her left arm.

An MRI performed on Plaintiff's lumbar spine in October 1999 showed degenerative changes and a focal fluid collection posterior to the thecal sac extending down to the L5 level which had decreased in size since March 1999. The MRI also revealed mild grade I spondylolisthesis of L4 on S1, bilateral hypertrophic facet degenerative changes causing narrowing of the neural foramina, and diffuse disc bulges at L2–3 and L3–4. Detailed nerve conduction studies of Plaintiff's lower extremities performed in December 1999 were within normal limits and showed no evidence of sensory or peroneal neuropathy.

In May 2000, Plaintiff complained to Dr. Mack of soreness in her hips and neck. Dr. Mack noted that Plaintiff reported slight soreness in her back, that her reflexes were absent bilaterally, and that her straight leg raises were positive on the left. X-rays showed disc disease at C6–7 and C5–6; an MRI showed a herniated disc at C5–6 which caused effacement of the thecal sac and mild spinal stenosis and a mild central disc bulge at the C6–7 level. The MRI also revealed postoperative changes with a focal fluid collection, a broad-based disc bulge at L2–3, and a central disc herniation at L3–4. After a September 2000 MRI, Dr. Mack recommended an anterior cervical fusion at C6–7 and C5–6 because her cervical spine showed a central disc herniation at C5–6 and left paracentral disc herniation at C6–7.

## B. JANICE OSHKESHEQUOAM'S TESTIMONY

Plaintiff testified at the hearing conducted by ALJ Welsch.[2] Regarding her medical condition, Plaintiff testified that she was unable to work, mostly due to her back; however, Plaintiff also stated that she has problems with her neck and with her hands and that she suffers from hepatitis C and diabetes. Plaintiff testified that she has had three surgeries on her hands for carpal tunnel syndrome (once on the right hand and twice on the left) and

2. Plaintiff also testified at the prior hearing conducted by ALJ Lipe.

that she has undergone back surgery. Plaintiff stated that she has pain and numbness in her hands which radiates down to her fingers and which causes her hands to cramp up. Plaintiff also complained of headaches, of being tired, and of degenerative disk disease which causes pain in her back.

Regarding her daily activities, Plaintiff testified that she took care of her own personal hygiene needs, that she drove when necessary, that she did her own housework, and that she performed her own shopping. In addition, Plaintiff stated that she watched her grandchildren once a week and that she liked to read, watch television, and was attempting to learn her native tongue. However, Plaintiff testified that these activities were extremely limited in duration and scope and that, frequently, these activities would exhaust her.[3]

## C. STEPHAN DOLAN'S TESTIMONY

Vocational expert Stephen Dolan also testified at the hearing conducted by ALJ Welsch. ALJ Welsch submitted to Dolan a hypothetical which was based upon Plaintiff's age, education, past work experience, and medical restrictions. Dolan opined that a person with the limitations imposed in the hypothetical possessed transferrable skills. Specifically, Dolan asserted that the skills developed for taking care of individuals which were possessed by the hypothetical person would transfer to childcare jobs. In addition, Dolan testified that the hypothetical person could also perform unskilled, entry-level work as a bartender (of which there are 12,000 jobs in Illinois), some security jobs (of which there are 2,000 jobs in Illinois), some office clerk jobs (of which there are 3,000 jobs in Illinois), and some packaging machine operator jobs (of which there are 1,000 jobs in Illinois).[4]

## D. ALJ WELSCH'S FINDINGS

ALJ Welsch found:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in the Social Security Act and is insured for benefits through September 30, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b) & § 416.920(b).

4. These medically determinable impairments have not been demonstrated by claimant to meet or medically equal one of the listed

---

3. Plaintiff gave substantially similar testimony at the hearing conducted by ALJ Lipe. As for her back pain, Plaintiff testified that she underwent back surgery in 1976 and that she experiences pain from about the middle of her back down to her tail bone, moving down into her legs. Plaintiff testified that turning, bending, and getting up and down aggravated her pain. On a scale from one to ten (ten being the most severe), Plaintiff testified that her back pain was a six or seven.

4. Vocational expert Douglas D. Sleade testified at the hearing conducted by ALJ Lipe.

Sleade testified that a person with Plaintiff's past skills would possess transferable skills to a couple of light jobs, including preschool teacher and home health care aide. In addition, in a response to a hypothetical presented by ALJ Lipe based upon a hypothetical person with Plaintiff's age, education, past work experience, and medical restrictions, Sleade testified that this hypothetical person could perform light exertional level unskilled jobs such as child care worker, parking lot attendant, and guard watchman of which there were a significant number of jobs in the economy.

impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding pain credible to the extent they are consistent with the residual functional capacity set forth below in number 7.

6. The undersigned has considered all of the medical opinions in the record regarding the severity of claimant's impairments (20 C.F.R. § 404.1527 & § 416.927).

7. The claimant has the residual functional capacity to perform light work with the following exceptions. She should not climb ladders, ropes, or scaffolding. She should not work at unprotected heights. She should not perform rapid fine manipulations with her hands. She should not perform repetitive bending or stooping. She is best suited for a job which allows her to sit or stand as needed. These limitations are based primarily on pain, and the possibility of pain exacerbation with a more strenuous RFC.

8. The claimant is unable to perform past relevant work (20 C.F.R. § 404.1565 & § 416.965).

9. Prior to May 10, 1999, the claimant was less than 55 years old and considered to be closely approaching advanced age. As of May 10, 1999, the claimant is considered to be 55 years old and is considered as being of advanced age (20 C.F.R. § 404 1563 & 416.963).

10. The claimant has "a limited education" (C.F.R. § 404.1564 & § 416.964).

11. The claimant has transferable skills from her job as a mental health aide to the job of childcare worker (20 C.F.R. § 404.1568 & § 416.968); however, this job will not be considered as it involves lifting infants.

12. The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using MedicalVocational Rule 202.11 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs are included in the decision.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time prior to May 10, 1999. On May 10, 1999, the claimant is considered disabled by virtue of attaining age 55.

It is the decision of the Administrative Law Judge that the claimant became entitled to a period of disability and Disability Insurance Benefits, under Sections 216(i) and 223, respectively, of the Social Security Act as of May 10, 1999, but not prior thereto.

It is the further decision of the Administrative Law Judge that the claimant is eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act on May 10, 1999, but not prior thereto. The component of the Social Security Administration responsible for authorizing Supplemental Security payments will advise the claimant regarding the non-disability requirements for these payments, and if eligible, the amount and the months for which payment will be made.

### III. LAW AND STANDARD OF REVIEW

 In order to be entitled to SSI and/or DIB, the claimant must generally

show that his inability to work is medical in nature and that he is disabled. SSI and DIB are meant only for "sick" or "disabled" persons and is not intended to be a surrogate unemployment insurance or a welfare program. *Jones v. Shalala,* 10 F.3d 522, 526 (7th Cir.1993). Thus, economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether the claimant is eligible for SSI and/or DIB. *Id.*

Establishing disability under the Social Security Act is a two-step process. First, the claimant must be suffering from a medically determinable physical or mental impairment, or combination of impairments "which can be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the claimant unable to engage in any substantial gainful employment. *McNeil v. Califano,* 614 F.2d 142, 143 (7th Cir.1980).

The factual determination is made using a five-step test. The steps are examined in order as follows:

1. Is the claimant presently employed?
2. Is the claimant's impairment "severe?"
3. Does the impairment meet or exceed one of a list of specified impairments?
4. Is the claimant able to perform his former work?
5. Is the claimant able to perform any other work in the national economy?

20 C.F.R. §§ 404.1520, 416.920; *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995). If the claimant can satisfy steps one, two, and three, he "will automatically be found disabled." *Knight,* 55 F.3d at 313. If the claimant "satisfies steps one and two, but

not three, then he must satisfy step four." *Id.* If the claimant satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing other work in the national economy, *i.e.* step five. *Id.* If the Commissioner establishes that the claimant can perform other work in the national economy, SSI and/or DIB will be denied.

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The Court must only determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A credibility determination by the ALJ will not be disturbed unless it is "patently wrong." *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir.1994).

## IV. ANALYSIS

Plaintiff advances three reasons why the Court should reverse Defendant's decision to deny her applications for SSI and DIB. The Court will address her arguments *seriatim.*

### A. *REQUIREMENTS OF LISTING 1.05C*

Plaintiff argues that she meets the requirements of Listing 1.05C. As such, Plaintiff asserts that she is disabled and that Defendant erred at the third step of the applicable test. Plaintiff contends that

the medical record is replete with evidence substantiating her back pain and that the record establishes each element of Listing 1.05C, not just through her own subjective complaints and testimony, but also through objective medical testing, clinical signs, and diagnoses by medical professionals. Accordingly, Plaintiff contends that she meets the requirements for being considered disabled set forth under Listing 1.05C and that Defendant erred in not so finding.

■ Eligibility under Listing 1.05C requires a claimant to demonstrate that he suffers from a vertebrae disorder with the following symptoms persisting for at least twelve months despite prescribed therapy: (1) pain, muscle spasm, and significant limitation of motion of the spine; and (2) appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. 20 C.F.R. § 404, Subpart P, App. 1, § 1.05C. A claimant must present medical findings that match or equal in severity all of the criteria specified by the listing. *Sullivan v. Zebley,* 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Pope v. Shalala,* 998 F.2d 473, 480 (7th Cir.1993), *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561 (7th Cir.1999); 20 C.F.R. § 404.1525(c).

In the instant case, the Court finds that Defendant did not err at step three. Although Drs. Mack and Bilinsky observed/noted that Plaintiff had muscle spasms, two references to muscle spasms over the course of a six-year medical history are an insufficient basis upon which to establish a disability pursuant to Listing 1.05C. On the contrary, in order to be considered disabled pursuant to Listing 1.05C, more is required: "Appropriate abnormal physical findings must be shown to persist on repeated examinations despite therapy for a reasonable presumption to be made that severe impairment [under Listing 1.05C] will last for a continuous period of 12 months." 20 C.F.R. Part 404, Subpart P., App. 1 § 1.00B. Likewise, although Dr. Bilinsky reported some atrophy, "a report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs ... given in inches or centimeters." *Id.*

Furthermore, although it is clear that Plaintiff has suffered some motor loss due to her back, neck, arm, and hand pain, the Court agrees with Defendant that it is not the type of loss sufficient to establish the disability requirements of Listing 1.05C. Although in February 1996 Dr. Trudeau found that Plaintiff had diminished sensation and hypoactive knee and ankle jerks, he also noted that detailed nerve conduction studies in both legs were normal and that an EMG of her left lower extremity showed only mild radiculopathy. In addition, Drs. Bilinsky, Chapa, and Mehra noted that Plaintiff had little difficulty walking, that her gait was normal, and that her muscle tone was normal. *See* 20 C.F.R. Part 404, Subpart P., Ap. 1 § 1.00B (providing that an "inability to walk on heels or toes, to squat, or to arise from a squatting position, where appropriate, may be considered evidence of significant motor loss."). Accordingly, the Court finds that Defendant did not err in concluding that Plaintiff did not meet the requirements set forth in Listing 1.05C to be considered disabled and, thus, did not err at step three of the applicable test.

B. *TREATING PHYSICIANS' OPINIONS*

Plaintiff also argues that Defendant erred at step five of the applicable test. Specifically, Plaintiff argues that Defendant did not give sufficient credence to her treating physicians' opinions regarding her disability and her ability to work. Based upon this error, Plaintiff asserts that Defendant further erred in determining her

RFC, in determining the extent to which she was able to perform work in the economy, and in determining the extent to which those jobs exist. Accordingly, Plaintiff contends that the Court should reverse Defendant's denial of her applications for SSI and DIB because Defendant failed to carry her burden at step five.

As noted *supra,* the Seventh Circuit remanded this case to Defendant "[b]ecause the ALJ appears to have ignored evidence from the only examining physician to offer an opinion on [Plaintiff's] lifting ability...." *Oshkeshequoam,* 2000 WL 328123, *2. Rather than whole-heartedly comply with this lawful directive from the Seventh Circuit, ALJ Welsch took issue with the remand and with the Seventh Circuit's prudence in doing so.

Prior to the start of the hearing, ALJ Welsch had the following colloquy with Plaintiff's counsel:

> ALJ: Okay. Then, we will proceed. One thing that I would like to point out first though, I'm a little puzzled by the Circuit Court's remand because they seem to remand this case focused on whether or not Administrative Law Judge Lipe accepted Dr. Max [*sic*] conclusions about a five pound lifting limit. And in Judge Lipe's decision he states that the claimant stated at previous hearing that she was able to frequently lift a gallon of milk and of course we know a gallon of mile [*sic*] weighs eight pounds. So, we have the claimant stating she can lift more than five pounds and we have Judge Lipe stating why he does not find Dr. Max conclusions credible. So I'm not quite sure what—
>
> \*　\*　\*　\*　\*　\*
>
> ALJ: No, I mean, I understand what your argument is, I don't understand how that argument could persuade the court and maybe it didn't and that's why they sent it back. But it seems

like—what I have to deal with is the reason they remanded it, which seems inconsistent with the findings in the prior decision that the—

> Atty: Well Judge Lipe found that she could lift 20 pounds and I don't know—
>
> ALJ: But they sent it back because of his not addressing Dr. Max statement that she couldn't lift more than five pounds. And Judge Lipe seemed to me to do a fairly good job of explaining why he didn't find Dr. Max conclusions credible in general.
>
> Atty: I, I, yeah and that was, they're fully aware all three judges were fully aware of that because it came up in the argument because the secretary's counsel raised it.
>
> ALJ: Well I'm—did they know, did they know that a gallon of milk weighs more than five pounds?
>
> Atty: I don't know that they asked that. I didn't make a [inaudible].
>
> ALJ: Because you see that's in the decision just before the credibility issue with Dr. Max conclusion. There's the statement that the claimant stated she could frequently lift a gallon of milk, but I don't want to make too much out of that I'm just saying the decision itself shows that the claimant said she could lift more than five pounds and—
>
> Atty: I don't think she said she could do it frequently.
>
> ALJ: That's what the decision says. I don't know what was actually said, I haven't read the transcript, but that's what the decision said and that's what the court had in front of him, so I'm just pointing that out on the record that I am puzzled of why it was remanded on the issue of that five

pound limit when Judge Lipe clearly rejected the conclusions—

\* \* \* \* \* \*

ALJ: Asked that and quite frankly Dr. Max has not sent the claimant, from what I can see from the record to a functional capacity evaluation. And those statements are not much more than any guesses of what a particular individual can do in the absence of any kind of testing. And they're really not, in my opinion, many times a medical opinion, it's a conclusionary opinion possibly based on medical facts of what a usual person can or cannot do. But I just wanted to point out, on the record, I'm puzzled by why the Court of Appeals would send it back on this issue since the decision and you look at the burdens of proof on issues of credibility, etcetera. I am just making the point on the record that I really don't understand why it was sent back on that issue....

The Court believes it was necessary and important to repeat, *verbatim*, ALJ Welsch's comments because the Court believes that the angst with which she viewed this remand permeated and clouded her decision. In fact, in her decision, ALJ Welsch specifically incorporated ALJ Lipe's factual analysis and went so far as to challenge the Seventh Circuit's determination that ALJ Lipe had not adequately considered Dr. Mack's opinion: "The primary issue on appeal, and the reason the case was remanded was due to the Appeals Court's concern that Judge Lipe had not adequately considered Dr. Mack's statement that claimant had a five pound lifting limit. However, Judge Lipe explained in the decision that he did not find Dr. Mack's conclusions credible."

It is with these precatory comments in mind that the Court finds that Defendant, again, failed to adequately consider the opinions of Plaintiff's treating physicians in denying her applications for SSI and DIB, and thus, Defendant erred in determining her RFC and her ability to perform work in the economy. Accordingly, the Court reverses Defendant's decision.

The Seventh Circuit has explained:

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir.2000). Nonetheless, a claimant is not entitled to disability benefits simply because her physician states that she is "disabled" or unable to work. *See Clifford,* 227 F.3d at 870. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *See id.;* 20 C.F.R. § 404.1527(e)(1).

We must keep in mind the biases that a treating physician may bring to the disability evaluation. "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir.1985). Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise. *See id.*

*Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001).

In the present case, the Court finds that Defendant inappropriately failed to give controlling weight to the opinions of Drs. Mack, Trudeau, Meyer, and Lynch. The medical evidence presented to ALJ Welsch clearly establishes that Plaintiff has degenerative disc disease and other spinal impairments which cause pain and limitations

of movement as well as having a well-documented history of carpal tunnel syndrome in both hands. Based upon the medical evidence compiled over the years, Drs. Mack and Trudeau opined that Plaintiff is disabled. ALJ Welsch disagrees with these conclusions, principally, on three grounds-none of which have any merit.

■ *First*, ALJ Welsch found that Dr. Mack's conclusion regarding Plaintiff's disability should not be given controlling weight because it is not supported by objective medical evidence and is contradicted by the opinions and findings of other medical professionals. In reaching this conclusion, ALJ Welsch noted that detailed nerve conduction studies performed by Dr. Trudeau on Plaintiff's lower extremities were within normal ranges and that MRI's showed only mild to moderate radiculopathy. Moreover, ALJ Welsch relied upon Dr. Chapa's finding in 1996 that Plaintiff had no motor weakness or muscle atrophy, on Dr. Mehra's finding that Plaintiff had normal muscle tone, coordination, strength, and gait, and on an emergency room physician's notation after her automobile accident that Plaintiff had no neurological abnormalities in reaching her conclusion that Dr. Mack's opinion should not be given controlling weight. Finally, ALJ Welsch held that Dr. Mack's five pound weight-lifting restriction imposed upon Plaintiff was without basis in light of the two state physicians' opinions regarding her capacity to lift.

■ However, Dr. Chapa's examination and evaluation cannot reasonably be used to refute Dr. Mack's opinion. Dr. Chapa's evaluation came before Plaintiff had undergone further testing, including an MRI, and before she underwent decompression surgery. Dr. Chapa's report provides no clue as to which, if any, medical records he reviewed or to what tests, if any he performed, and it appears from his report that he was unaware of the fact that Plaintiff had previously undergone back fusion surgery. More importantly, Dr. Chapa's examination lasted only 22 minutes while the Commissioner's own regulations require a general physical examination to last at least 30 minutes. *See* 20 C.F.R. § 404.1519n(a)(1)(providing that "[t]he following minimum scheduling intervals (*i.e.*, time set aside for the individual, not the actual duration of the consultative examination) should be used. (1) Comprehensive general medical examination-at least 30 minutes; . . . .").

Furthermore, although it is true that Dr. Mehra examined Plaintiff and reported that she demonstrated normal muscle tone, coordination, strength, gait, and deep tendon reflexes, the Court does not believe that this one medical opinion is sufficient to rebut the opinions of Drs. Mack and Trudeau who have an established and long history of treating Plaintiff; even Dr. Bilinsky acknowledged that Plaintiff demonstrated diminished grip strength. *See Grindle v. Sullivan*, 774 F.Supp. 1501, 1508 (N.D.Ill.1991)(holding that "[s]imply because a nonexamining physician may disagree with the conclusions of a treating physician, that is just not enough to support a finding that the treating physician's evidence is not credible."). The Court's finding is especially true of the two state agency physicians who did not examine Plaintiff yet made findings regarding her capacity to lift which were well in excess of what even ALJ Welsch found Plaintiff capable of lifting.

Finally, ALJ Welsch made no attempt whatsoever to rebut Dr. Trudeau's opinion that Plaintiff is disabled. More importantly, in order for the Court to adopt ALJ Welsch's finding that the medical evidence does not support Dr. Mack's opinions, the Court would also have to accept the conclusion that Dr. Mack performed decom-

pression surgery upon Plaintiff's back without sufficient medical justification. This proposition the Court is unwilling to accept.

Plaintiff suffers from degenerative disc disease which, by definition, means that her back is getting progressively worse. In fact, Dr. Choi (*i.e.*, the surgeon who first operated on Plaintiff's back) informed Plaintiff in 1976 that she may require additional surgery in the future. Dr. Mack performed that additional surgery and has recommend more surgery assuming that Plaintiff can tolerate it. ALJ Welsch makes no reference to the need for the surgery performed by Dr. Mack other than to say that Plaintiff appears to have fully recovered. In short, the Court finds no reason why Drs. Mack and Trudeau's opinions should not be given controlling weight.

■ *Second,* ALJ Welsch concludes that Dr. Mack's opinion should not be given controlling weight because he is biased in favor of Plaintiff. ALJ Welsch opines in her opinion that "[i]t should also be noted that the tone of Dr. Mack's statements, as evidenced in his April, 1997, letter, seems to indicate he has become an advocate for disability benefits, rather than an unbiased source of opinion." Moreover, ALJ Welsch reiterates ALJ Lipe's statement that Dr. Mack should not be found to be credible because he "tries to give his patients a break."

However, there is no evidence in the record that Dr. Mack is biased in favor of Plaintiff, other than the fact that Dr. Mack has concluded upon his extensive, long-

care treatment of Plaintiff that she is disabled. *See Criner v. Barnhart,* 208 F.Supp.2d 937, 957 (N.D.Ill.2002) (noting that there was no evidence in the record to substantiate a claim that the claimant's treating physician was biased in her favor other than his disability determination in her favor). As explained· *supra,* objective medical evidence exists in the record which supports Drs. Mack and Trudeau's opinions, and thus, the opinions should be given controlling weight.[5]

*Third,* ALJ Welsch found that Dr. Mack's conclusion regarding Plaintiff's disability should not be given controlling weight because it was contradicted by Plaintiff's own testimony at the hearings regarding her ability to perform daily activities. Specifically, ALJ Welsch noted that Plaintiff testified at the hearing before ALJ Lipe that she could lift more than five pounds (*i.e.*, that she could lift a gallon of milk which weighs eight pounds). In addition, she testified at the second hearing that she could vacuum, clean her own apartment, shop, prepare meals, climb ladders, supervise children, and drive. Thus, ALJ Welsch found that Dr. Mack's five pound weight-lifting restriction which he placed upon Plaintiff was without merit in light of Plaintiff's own testimony regarding her daily activities.

However, ALJ Welsch has mis-characterized Plaintiff's testimony. Initially, the Court notes that, although ALJ Welsch praises the work of ALJ Lipe and, in most cases, adopts it as her own, ALJ Lipe characterized Plaintiff as performing "very little, if any, daily activities" while, four

---

**5.** Interestingly, ALJ Welsch finds Dr. Mack to be biased essentially because he has reached a conclusion which is favorable to Plaintiff. Besides the obvious point that most individuals would like his or her physician to be watching out for his or her best interest, ALJ Welsch has no qualms or questions regarding the state agency physicians' potential for bias.

This is in spite of one of the physician's incredible conclusions, after merely reviewing the medical evidence, that Plaintiff could occasionally lift *fifty* pounds and could occasionally climb, balance, stoop, kneel, crouch, and crawl and perform medium level work-findings which even ALJ Welsch was unwilling to make.

years later, ALJ Welsch describes Plaintiff as engaging in "extensive daily activities."

In any event, Plaintiff testified that her daily activities were limited to those of necessity. Although she does drive, she drives only infrequently and for short durations. Although she vacuums and cleans her apartment, it is an extremely small apartment, takes a long time to complete, and "just kills my back." Although she watches her grandchildren, she does so only once a week for a few hours, does not prepare any meals for them, and is basically present only as adult supervision over children who can, basically, take care of themselves.

Although she did testify that she moved a house plant while on a ladder, she did not (contrary to ALJ Welsch's finding) testify that she carried or moved the step ladder any distance, nor did she testify that she lifted the houseplant. It is quite possible that she merely slid it across a shelf without the necessity of lifting it. In any event, while moving the plant, Plaintiff fell off of the ladder and broke her arm which would indicate to the Court that she should not have been performing the act in the first place—a fact which she acknowledged during the hearing.

Finally, contrary to ALJ Welsch and ALJ Lipe's findings, Plaintiff did not testify that she could frequently lift a gallon of milk. Her testimony before ALJ Lipe was:

ALJ: How many pounds can you lift comfortably now?

Clmt: I try not to lift anything. If I have to—

\*　　\*　　\*　　\*　　\*　　\*

Atty: And with respect to lifting, the judge asked how much you could lift comfortably. Are you able to lift things with some pain? Some degree of pain?

Clmt: Yeah, some things, yes.

Atty: How about a gallon of milk? Could you describe how you do that and what you experience when you do that or if you do that?

Clmt: I don't—I don't buy the milk by the gallons.

Atty: And why is that?

Clmt: It's just too heavy to carry.

Atty: What size do you buy?

Clmt: A half gallon.

Atty: Do you have any problems with that?

Clmt: To hold onto it.

Atty: And how do you manipulate the half gallon of milk?

\*　　\*　　\*　　\*　　\*　　\*

Clmt: Both my hands. I have to hold it with both of them.

Thus, contrary to ALJ Welsch's assertion, Plaintiff did not testify before Judge Lipe that she could frequently lift a gallon of milk. Although ALJ Welsch admitted in her opinion that she did not know why Dr. Mack chose five pounds as Plaintiff's weight-lifting restriction limit, that is the limit which he chose based upon his medical diagnosis and opinion. Although she admitted that it may not be possible to determine scientifically exactly how much Plaintiff can lift, ALJ Welsch was willing to wholly disregard Dr. Mack's opinion for that of Dr. Mehra's diagnosis who examined Plaintiff only once and made no recommendations regarding her capacity to lift and that of two state agency physicians who merely reviewed the file and opined that Plaintiff could lift an amount greater than five pounds. In short, the Court believes that ALJ Welsch has improperly submitted her judgment for that of Plaintiff's treating physicians. *See Clifford,* 227 F.3d at 870 (holding that an ALJ must not substitute his own judgment for a physician's opinion without relying upon other medical evidence or authority in the rec-

ord); *see also Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990)(warning that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.").

▮ Accordingly, the Court finds that ALJ Welsch erred in failing to give controlling weight to Drs. Mack and Trudeau's opinions that Plaintiff was disabled. Specifically, ALJ Welsch failed to properly consider and rebut Dr. Mack's opinion regarding Plaintiff's five pound weight-lifting restriction despite the clear direction from the Seventh Circuit that she do so on remand. As such, the Court finds that ALJ Welsh erred at step five of the applicable test in concluding that Plaintiff could perform work in the economy, erred in concluding that Plaintiff was not disabled prior to her fifty-fifth birthday, and erred in denying her applications for SSI and DIB.

### C. *MEDICAL VOCATIONAL GUIDELINES*

Finally, Plaintiff argues that Defendant erred in denying her applications for SSI and DIB because a rational application of the medical-vocation guidelines establishes that she is disabled. Plaintiff asserts that, had ALJ Welsch limited her RFC to performing a full range of sedentary work at age fifty to fifty-five, she would automatically have been considered disabled pursuant to the medical-vocational guidelines. *See* Vocational Rule 201.09 & 201.10. However, ALJ Welsch concluded that Plaintiff had a RFC of performing a limited range of light work and that this finding rendered the guidelines inapplicable to her.

Plaintiff contends that, in effect, she has fallen in-between the guidelines and that ALJ Welsch used this phenomenon in order to deny her applications for SSI and DIB which she would have been entitled to

had the guidelines applied. Plaintiff claims that this result (that a person who is able to perform work with fewer restrictions and has fewer jobs available to him in the national economy is considered disabled while one who is only able to perform work with greater restrictions and with fewer jobs available to him is not considered to be disabled) is nonsensical and unfair. Thus, Plaintiff contends that the Court should find her to be disabled based upon a rational interpretation of the medical-vocational guidelines.

ALJ Welsch discounted Plaintiff's argument out-of-hand as being "untenable" and "unpersuasive." In fact, ALJ Welsch went so far as to say: "While the representative's arguments may be attractive to the uninitiated, they are not legally logical."

However, the Seventh Circuit in remanding this case opined that "there is some logic to [Plaintiff's] argument and it may bear future consideration." *Oshkeshequoam,* 2000 WL 328123, *2. In addition, the Ninth Circuit has directly held that the

> [r]egulatory language supports the position that an ALJ may not find from vocational testimony that a claimant, deemed disabled under the grids, nonetheless could perform a substantial number of jobs and not be disabled. *See* 20 C.F.R. Part 404, Subpart P, App. 2, §§ 200.00(d), (e). We interpret the regulations to require the Secretary to reject vocational testimony that is inconsistent with the grids' overall framework.

*Swenson v. Sullivan,* 876 F.2d 683, 688 (9th Cir.1989).

This is not the only jab, however, that ALJ Welsch took at the intellect of the courts which would dare disagree with her findings. On the contrary, the following colloquy occurred with Plaintiff's counsel at the hearing conducted by ALJ Welsch:

ALJ: And also you might want to send along your brief so that we can address that other issue as well.

Atty: You want the brief from the secretary too and my reply?

ALJ: Yeah, that, that'll be good.

Atty: Okay.

ALJ: Then we can try to get it all dealt with.

Atty: Well, it was a fun argument.

ALJ: I don't see much merit into it on the surface, but, you know, I may change my mind when I read your—

Atty: The Ninth Circuit wants it.

ALJ: Great. Well, they see so few cases and they don't understand this huge background that leads up to something sometimes. So what seems logical is illogical. What seems illogical is logical sometimes. You know what it's like in this area.

It is unclear to the Court whether ALJ Welsch was saying that the circuit courts in general (and the Ninth Circuit specifically) have only a few cases on their dockets, or whether she was saying that those courts hear only a few social security cases on appeal. What is clear is that ALJ Welsch should have been loathe to opine that the courts of appeal "don't understand this huge background that leads up to something sometimes." As far as the Court is aware, both the district and the circuit courts receive the entire administrative record on appeal when a claimant appeals Defendant's final decision regarding the claimant's application for SSI or DIB.

In any event, it is not necessary for the Court to take a position on this argument. Because it is clear that Defendant's decision regarding Plaintiff's applications for SSI and DIB is not supported by substantial evidence, the Court may reverse Defendant's decision for that reason alone without taking a position on this issue of first impression within this circuit.

## V. CONCLUSION

 Title 42 U.S.C. § 405(g) authorizes the district court to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Id.* A district court need not remand a case "when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion." *Holden v. Shalala,* 846 F.Supp. 662, 669–70 (N.D.Ill.1994)(internal citations omitted).

Here, the Court finds that the outcome at step five of the applicable test is clear and also finds that no useful purpose would be served by remanding this case to Defendant for further proceedings. As one court has explained: "When the ALJ fails to point to clear and convincing reasons for rejecting the conclusion of the treating physician, or provide specific, legitimate reasons based on evidence for disregarding that conclusion, and when the administrative record is fully developed, benefits should be awarded." *Grindle,* 774 F.Supp. at 1513–14, *quoting Boyes v. Sullivan,* 901 F.2d 717, 722–23 (9th Cir.1989). The record is fully developed, and Defendant's decision is not supported by substantial evidence. Accordingly, the Court finds Plaintiff to be disabled as that term is defined in the Social Security Act and also finds that she is entitled to SSI and DIB for the applicable period prior to her fifty-fifth birthday.

*Ergo,* Plaintiff's Motion for Summary Judgment (d/e 10) is ALLOWED, and Defendant's Motion for Summary Judgment (d/e 11) is DENIED. The Court finds that an additional remand for further evidentiary proceedings would serve no useful purpose but would merely cause further delay. Accordingly, the decision of the Commissioner is hereby REVERSED, and

this case is REMANDED, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner with directions to compute and award benefits to Plaintiff for the applicable time period prior to her fifty-fifth birthday.